UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF ) | No. 3:19-mj-59-mms |
| THE UNITED STATES OF AMERICA FOR A ) | |
| WARRANT AUTHORIZING THE ) | |
| SEARCH OF: 3711 CASPER COURT #3, ) | |
| HEREIN THE TARGET RESIDENCE ) | |
| ) | |

AFFIDAVIT IN SUPPORT OF AN APPLICATION
FOR A SEARCH WARRANT

I, G.K. Dorr, being first duly sworn, hereby depose and state as
follows:

### AFFIANT BACKGROUND

1. I have been a law enforcement officer with the Anchorage Police
Department since December of 1997, and have been conducting drug
trafficking investigations as a detective since 2002. I have been
assigned as a Task Force Officer with the Drug Enforcement
Administration's Anchorage district office since August of 2008, and
have been deputized as a federal officer during this assignment.
During this assignment, I have focused on drug interdiction
investigations, and have become familiar with the methods and
practices commonly used by drug traffickers to introduce drugs into
the state of Alaska, and likewise am familiar with methods used by
traffickers to transmit drug proceeds from Alaska to sources of supply
located outside Alaska.

2. I have more than twenty-one years of law enforcement experience. I
was employed as a police officer by the Metropolitan Police
Department, Washington, D.C., (MPD) from June of 1987 until December
of 1988.

3. I attended and graduated from a six-month police academy operated
by MPD. While attending MPD's academy, I received training and
instruction on devices, paraphernalia, techniques, and practices used
by people engaged in the use, possession, and trafficking of
controlled substances. In an extension of MPD's training, and
subsequent to graduation from MPD's academy, I received several months
of additional training and instruction under the tutelage and
supervision of a senior patrol officer before being certified. This
additional training also included the investigation of crimes

involving the use, possession, and trafficking of controlled substances in the Washington, D.C. area.

4. I attended and graduated from a five-month police academy operated by APD. While attending APD's academy, I received training and instruction on devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. In an extension of APD's training, and subsequent to graduation from APD's academy, I received three additional months of training and instruction from several APD Field Training Officers. This field training included investigation of crimes involving the use, possession, manufacture, and trafficking of controlled substances in the Anchorage area.

5. In March of 2002, I attended the DEA's five-day Clandestine Laboratory Investigation/Certification Program. During this course, I learned how to identify, classify, investigate and dismantle clandestine laboratories in accordance with applicable OSHA and EPA regulations. Under the supervision of DEA chemists, I participated in the manufacture of methamphetamine using two different methods. In June of 2002, I attended the DEA's 80 hour Basic Drug Investigations course. In this course, I learned, among other things, about the devices, paraphernalia, techniques, materials, and practices used by people engaged in the use, possession, manufacture, importation, and trafficking of controlled substances, including cocaine, heroin, methamphetamine, and marijuana, among others.

6. During my tenure as a police officer, I have conducted and/or participated in numerous investigations relating to the use, possession, manufacture, importation, and trafficking of controlled substances, and I have become familiar with devices, paraphernalia, techniques, and practices used by people engaged in the use, possession, manufacture, and trafficking of controlled substances. I have conducted and/or participated in investigations which have resulted in the seizure of marijuana, marijuana grow operations, cocaine hydrochloride, cocaine base (crack), opium, PCP, heroin, ketamine, methylenedioxymethamphetamine (MDMA/ecstasy), methamphetamine, methamphetamine laboratories, prescription medications, firearms, cellular telephones, surveillance systems, cameras, memory cards, computers, routers, cable modems, documents, money, and precious metals. I have also conducted numerous interviews of people involved in the use, possession, manufacture, and trafficking of controlled substances, adding to my knowledge of the illegal drug culture in the Anchorage area. During my tenure as a drug investigator, I have been trained in and have utilized various investigative techniques including physical and electronic

surveillance; parcel and courier interdiction; controlled deliveries; the recruitment of cooperators; and controlled drug purchases utilizing both cooperating sources and undercover agents. In addition to my formal training and experience, I have gained knowledge and insight by working and speaking with many experienced law enforcement agents from local, state, and federal agencies, and I consider this knowledge and insight to be an integral part of my experience and training.

7. I received a bachelor's degree from the University of Maryland's Institute of Criminal Justice and Criminology in May of 1987. I received a Juris Doctor from Mercer University's Walter F. George School of Law in May of 1992.

## BACKGROUND AND PURPOSE OF AFFIDAVIT

8. This investigation relates to the suspected methamphetamine trafficking and money laundering activities of Harvelle Lee EARL Sr.; Vernell GLASGOW II; Brandon Lavell GLASGOW, Srisuda Ali MATTHEWS; Viki Rae KELLY, Prentiss De Aun JONES, and Kapesia Montray GRAY in the commission of the following offenses, among others:

     a.    Title 21, United States Code, Section 846 and 841(a)(1) – Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances;

     b.    Title 18, United States Code, Section 1956(h) – Conspiracy to Launder Money;

     c.    Title 21, United States Code, Section 843(b) – Use of a Communication Facility to Commit, Facilitate, or Further the Commission of a Controlled Substance Offense.

9. I make this affidavit based, in part, on personal knowledge derived from my participation in this investigation and, in part, upon information and belief. The sources of my information and belief are: oral and written reports about this and other investigations, which I have received directly or indirectly from officers/agents of the Alaska Department of Public Safety including J. Miner, C. Scott, and D. Chaffin; D.E.A. T/F/O's C. Miller, and D. Boothroyd; IRS S/A Kyle Pudge; United States Postal Inspection Service S/A Andrew Grow, as well as sources of information as identified herein. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant, and does not set forth all of my knowledge about this matter. Facts not set forth herein are not being relied upon in reaching my conclusion that probable cause exists for the issuance of search warrants. Nor do I request that this Court rely

upon any facts not set forth herein when reviewing this affidavit in support of an application for a search warrant.

10. I submit this affidavit in support of my application for a warrant authorizing the search of searches of 3711 Casper Court #3, herein the TARGET RESIDENCE.

    a. 3711 Casper Court #3 is the residential apartment located at 3711 Casper Court #3 and consists of a residential apartment located in a bi-level, four unit apartment building. There are two apartments on the second floor, and two apartments on the first floor. The building is tan in color. The building is accessed by a common entry door, with each apartment having its own entry door. The TARGET RESIDENCE occupies the southern-most down stairs unit, and has the number "3" attached to the door. There is a door mat placed at the foot of the entry door to the TARGET RESIDENCE which reads that trespassers will be shot. A parking area for the building is located at the south end of the building, which opens onto Casper Court. There are four "closet" style storage units located on the north end of the building, presumably one for each apartment. These storage units are accessed from the exterior of the building. There are security cameras mounted on exterior walls of the building.

11. As more fully set forth herein, I submit there is probable cause to believe that search of the TARGET RESIDENCE will lead to evidence, fruits, and instrumentalities of violations of Title 21, Section 846 and 841(a)(1) - Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances; and Title 18, United States Code, Section 1956(h) - Conspiracy to Launder Money; and Title 21, United States Code, Section 843(b) - Use of a Communication Facility to Commit, Facilitate, or Further the Commission of a Controlled Substance Offense.

## METHOD OF OPERATION OF DRUG TRAFFICKERS

12. Based upon my training, experience and participation in this and other drug trafficking/financial investigations, and based upon my conversations with other experienced law enforcement agents and officers, with whom I work, I know the following:

    a. In my experience, I have found that the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon

the demand for and the available supply of the product.  It has been
my experience that drug traffickers keep records of their illegal
activities not only during the period of their drug trafficking
violations but also for a period of time extending beyond the time
during which the trafficker actually possesses/controls illegal
controlled substances.  The records are kept in order to maintain
contact with criminal associates for future transactions and so that
the trafficker can have records of prior transactions for which the
trafficker might still be owed money or might owe someone else money.

b.    I know that in *United States v. Terry*, 911 F.2d 272 (9th
Cir. 1990),  *United States v. Angulo-Lopez*, 791 F.2d 1394,1399 (9th
Cir.1986),  *United States v. Hernandez-Escargega*, 886 F. 2d 1560, 1567
(9th Cir. 1989) and in *United States v. Fannin*, 817 F. 2d 1379, 1381-
1382 (9th Cir. 1987), the court held that in the case of drug
traffickers, evidence is likely to be found where dealers live and a
search warrant may be properly issued against a suspected drug
dealer's residence despite the lack of direct evidence of criminal
activity at the residence.  The court also held, in *United States v.
Cardoza*, 769 F. 2d 625, 630 (9th Cir. 1985), that a search warrant may
be properly issued to search a drug trafficker's storage locker
despite lack of direct evidence linking the storage locker to criminal
activity.

c.    It is common for members of drug trafficking organizations to
maintain records evidencing their illegal activities including books,
ledgers, receipts, notes and other papers relating to the
transportation, ordering, possession sale and distribution of drugs
and the collection and transportation of drug proceeds.  I also know
that the aforementioned books, records and ledgers etc., are
frequently maintained in the drug trafficker's residence and sometimes
in the traffickers' vehicle(s).  Further, I know that these documents
are often retained long after the transactions to which they refer
have taken place.

d.    It is common for members of drug trafficking organizations to
conceal in their residences and businesses in strong boxes, safes,
lock boxes, concealed compartments and hidden rooms, large quantities
of U.S. currency, foreign currency, financial instruments, precious
metals, jewelry, and other items of value which are proceeds from drug
trafficking.

e.    I know that evidence of excessive wealth is probative
evidence of crimes involving greed, to include the distribution of
controlled substances.  Therefore, receipts showing the expenditure of
large sums of money and/or the expensive assets themselves are

evidence of drug trafficking.  I also know that drug traffickers commonly keep the expensive assets themselves and/or documentation of the purchase of the asset (receipts, warranty cards, etc.) in or about their residences, and sometimes documentation of these assets in their vehicles or businesses.

f.  It is common for members of drug trafficking organizations to utilize wire transfer companies, (i.e. Western Union, MoneyGram) to facilitate the movement of U.S. currency throughout the trafficking organization's area of operations.  I know that members of drug trafficking organizations will utilize nominee senders to disguise the origination of the funds and to break up the amount being sent by any one person.  I know that the actual owner of the currency will commonly provide the nominee sender with hand-written information concerning the intended recipient's name, intended pay-out location and amounts of money to be sent.  I also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee senders to maintain copies of the wire transfer receipts, amounts sent and tracking numbers.  I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, and vehicles.

g.  It is increasingly common for members of drug trafficking organizations to utilize direct cash deposits into a co-conspirator's bank accounts to facilitate the movement of U.S. currency throughout the trafficking organization's area of operations.  I know that members of drug trafficking organizations will utilize nominee depositors to disguise the origination of the funds and to break up the amount being deposited by any one person.  I know that the actual owner of the currency will commonly provide the nominee depositor with hand-written information concerning the intended recipient's name and account number and amounts of money to be deposited.  I also know that, in an attempt to keep track of the proceeds, it is common for the drug traffickers and/or nominee depositors to maintain copies of the deposit slips.  I also know that the aforementioned items are frequently maintained in the drug trafficker's and/or nominee depositor's residence, businesses, or vehicles.

h.  It is common for members of drug trafficking organizations to utilize express parcel delivery companies, (i.e. Federal Express, United Parcel Service, DHL, and U.S. Postal Service Express Mail) to facilitate the movement of controlled substances and U.S. currency throughout the trafficking organization's area of operations.  I also know that, in an attempt to keep track of the packages and their contents, it is common for the trafficker to maintain copies of the shipping receipts and tracking numbers.  I know that members of drug

trafficking organizations will utilize nominee senders/recipients to disguise the origination and destination of the packages. I know that the actual owner of the drugs/currency will commonly provide the nominee sender with hand-written information concerning the intended recipient's name and address. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, and vehicles.

i. It is common for members of drug trafficking organizations to utilize fraudulent identification, in order to purchase airline tickets, send wire transfers, rent residences and storage facilities and subscribe for telephone/cellular telephone service. I also know that it is common for drug traffickers to keep fraudulent identification nearby and easily accessible to facilitate their flight upon the discovery of their illegal activities by law enforcement. I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, businesses, or vehicles.

j. It is common for drug trafficking organizations involved in the purchase, dilution, and repackaging of controlled substances for distribution to maintain equipment and supplies (i.e. scales, baggies, cutting agents) on hand over a lengthy period of time, even when they do not have any controlled substances on hand. I also know that the aforementioned items are frequently maintained in the drug traffickers' residence or business. I have also found scales and packaging materials in traffickers' vehicles.

k. It is common for members of drug trafficking organizations to attempt to recruit couriers to transport drugs and/or U.S. currency throughout the trafficking organization's area of operations. I know that often times the courier's handler will provide the courier with hand-written notes regarding travel itinerary, hotel information and contact telephone numbers prior to the courier departing on the trip to transport drugs and/or money. I also know that often times the organizations will pay a flat rate (i.e. $2,000 per kilogram of cocaine) plus expenses for the couriers. Therefore, often times the couriers will keep handwritten itemized lists of expenses and/or receipts, in order to be reimbursed. I also know that the aforementioned items are frequently maintained in the courier's residence or residences and vehicles of members of the drug trafficking organization.

l. It is common for members of drug trafficking organizations to take or cause to be taken, photographs and/or videos of themselves and their co-conspirators and associates. It is also common for members of drug trafficking organizations to take or cause to be taken,

photographs and/or videos of themselves and/or their co-conspirators with controlled substances, large sums of money, guns and expensive assets (i.e. jewelry, luxury cars). I also know that the aforementioned items are frequently maintained in the drug trafficker's residence or business.

m. It is common for members of drug trafficking organizations to possess scanners, security cameras and computers (with Internet access) to protect and conceal their operation from law enforcement and other criminals and to monitor surveillance activities of law enforcement. Members of drug trafficking organizations often store records related to drug trafficking and money laundering activities using computer equipment. In addition, computers and peripheral devices, such as wireless routers and cable modems, may contain evidence of drug trafficking. For example, I know that drug traffickers commonly check the delivery status of parcels containing drugs and/or money by entering tracking numbers into parcel company or post office websites. These inquiries are captured by these websites, which identify the Internet Protocol (IP) address that performed the inquiry. The IP address can be linked to both a subscriber of internet service, as well as to a Media Access Control (MAC) address, which identifies the piece of computer hardware through which the internet was accessed while making the inquiry. A MAC address is a unique identifier assigned to every piece of hardware that connects to the Internet. In my experience, computers and peripheral devices such as wireless routers and cable modems are commonly maintained for long periods of time at the user's residence.

n. Based on my training and experience, I know that people involved in trafficking controlled substances frequently carry and possess firearms to protect themselves. Drug trafficking is an all-cash business, and drug traffickers are often the targeted by other criminals for robbery because those involved in illegal drug trafficking rarely report thefts or robberies of their drugs and money to the police. Therefore, they carry firearms to protect themselves, their drugs, and their proceeds. Also, lower level drug traffickers tend to be more at risk than higher-level traffickers. It is more likely that lower-level traffickers deal with strangers and drug addicts. Thus, lower-level narcotics trafficking can be more dangerous than dealing at the wholesale level, where there is already an established business relationship with larger customers. Lower level traffickers can be territorial, and can get into disputes with rival traffickers over customers and "turf". Finally, the customers of lower level traffickers are frequently addicts, who gather money to pay for their drugs through other crimes, primarily theft-related

crimes.  Because firearms are valuable to narcotics traffickers, customers with stolen firearms often trade them to traffickers in exchange for narcotics.

o.  It is common for members of drug trafficking organizations, in an attempt to disguise their identities and illegal activities, to use pre-paid cellular telephones and pre-paid long distance calling cards.  I know that often times the only way to connect a subject with a particular pre-paid cellular telephone or calling card is to seize the phone or calling card from the trafficker or his residence.  I also know that the aforementioned items are frequently maintained in the drug trafficker's residence, business, or vehicles.  Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources.  Further, I know that cell phones used by drug traffickers frequently contain data stored w/in which includes the telephone numbers, names, and/or aliases of drug customers and drug sources.  Finally, I know that in addition to names and numbers, cell phones used by drug traffickers commonly contain images and recordings of people involved in trafficking, images of firearms used in these activities, images of controlled substances, and images of drug trafficking proceeds, and further that these images are often retained long after the images are captured.

p.  It is common for members of a drug trafficking organization to attempt to legitimize their profits from the distribution of drugs. To accomplish these goals, drug traffickers utilize foreign and domestic banks and the bank's attendant services to include cashier's checks, safe deposit boxes, and money drafts.  Drug traffickers will also utilize the purchase/sale of real estate and vehicles to legitimize their profits.  I also know that the records of the aforementioned transactions are frequently maintained in the drug trafficker's residence, business, or vehicles.

q.  It is common for members of drug trafficking organizations to utilize businesses, both real and fictitious, to conceal both the distribution of drugs as well as to conceal the source of their illegal income.  It is common for drug traffickers to possess business licenses and articles of incorporation for these businesses, even if the businesses exist only on paper.  I also know that these records and documents are frequently maintained in the drug trafficker's residence or business.

r.  I have become familiar with the practice of some drug traffickers in the use of express parcel shipping services as a method of transporting illegal drugs into Alaska.  Using this method, a drug trafficker will acquire drugs from a source state.  The drugs will

then be placed in a parcel, and arrangements will be made for shipment to Alaska via express shipping services such as FedEx, UPS, DHL, and the United States Postal Service. Traffickers will commonly provide fictitious information for the sender's name, address, and telephone number. Likewise, traffickers will commonly provide a fictitious name for the recipient, but will use a genuine receiving address to ensure delivery. The use of a nominee's address is common for receipt of the parcel, as many traffickers are reluctant to receive parcels at their own addresses. Some traffickers are willing to be present at the receiving address when the parcel arrives. Other traffickers will avoid the receiving address until after delivery of the parcel, and others will instead direct a nominee to transport the parcel to second or subsequent locations. Additionally, traffickers will sometimes hi-jack an address, shipping a parcel to an address known to be vacant, or whose occupant's schedule is known to the trafficker, arranging delivery at a time when the occupant is expected to be absent. I am also familiar with the practice of some traffickers to pay nominees to obtain mailboxes to which parcels will be shipped. Based on my training and experience, I know that the locations where parcels containing controlled substances and/or drug proceeds are shipped to commonly hold evidence of drug trafficking.

s. Based on my training and experience, I know that drug traffickers commonly use nominees to conduct transactions which would otherwise require the trafficker to be identified, such as purchases and rentals of vehicles, residences and sometimes cell phones.

t. Based on my training and experience, I know that California is a source state, that is, a state from which controlled substances are commonly shipped to Alaska, and likewise, a state **to** which drug proceeds are commonly shipped.

u. Based on my experience, narcotics trafficking operates in a pyramid-like structure, with the largest wholesale traffickers at the top of the pyramid, and the traffickers who deal directly with customers at the bottom. There are several levels of traffickers in the middle. As you travel down each level of trafficker, the drugs can be diluted to increase their volume, and therefore profit. At the bottom level, drugs are sold to individual users who are often drug addicts.

v. Based on my training and experience, I know that people involved in the use, possession, manufacture, importation, and/or trafficking of controlled substances commonly possess and use cellular telephones, telephones, and computers to facilitate these activities. Regarding cellular telephones in particular, I know that drug

traffickers will use cellular telephones to facilitate their activities because of the mobility offered by cellular telephones. Further, drug traffickers are attracted to cellular telephones because they enable suspects to avoid the risks attendant with operating from a fixed location. Additionally, cellular telephones afford spontaneous access to drug customers and to drug sources. Further, I know that cell phones used by drug traffickers frequently contain data stored w/in which includes the telephone numbers, names, and/or aliases of drug customers and drug sources. Further, I know that in addition to names and numbers, cell phones used by drug traffickers commonly contain images and recordings of people involved in trafficking, images of firearms used in these activities, images of controlled substances, and images of drug trafficking proceeds, and further that these images are often retained long after the images are captured.

w. Based on my training and experience, I know that people involved in the use, possession, manufacture, importation, and/or trafficking of controlled substances commonly engage in these activities at all hours of the day and night.

x. Based on my training and experience, I know that trafficking controlled substances is a cash business, and frequently very lucrative. Also based on my training and experience, I know that people involved in the possession, manufacture, importation, and/or trafficking of controlled substances commonly possess money generated by these activities, and further that these people commonly possess stolen property accepted in exchanges for controlled substances. Further, based on my training and experience, I know that people involved in the possession, manufacture, and/or distribution of controlled substances commonly maintain and possess firearms to protect themselves, their controlled substances, and their trafficking proceeds. Further, I know that the above described documents, money, stolen property, and firearms are commonly found in the vehicles and residences of drug traffickers, as well as in other places maintained for the trafficking of controlled substances, as well as lower profile locations sometimes referred to as "stash houses."

## BASIS OF INVESTIGATION, SEIZURE OF $94,820.00

13. On Monday, 7/3/17 at approx. 11:11 hours, I heard from the manager of several express parcel shipping stores with locations in Anchorage. Manager told me that an employee at one of manager's stores had reported a suspicious transaction with a customer which had occurred on Saturday, 7/1/17. Manager told me that the employee told manager of a male customer who had presented a sealed parcel for shipping to a

Woodland Hills, California address, asserting it contained a candle. When the customer learned that he had missed the cutoff for Next Day Air delivery, he changed his mind about shipping and departed the store with the parcel. During the interaction, the employee recognized the customer's sender and recipient information as the same as that provided by other previous customers. Manager added that the employee had located records of three previous parcel shipments under the same sender / recipient information. I went to the store in question and contacted the employee.

14. Employee told me that the customer in question is a repeat customer who has previously come into the store and purchased cardboard shipping boxes, but whom does not typically ship parcels. On Saturday, 7/1/17, the customer came into the store and purchased several 10x10 cardboard cube style shipping boxes and departed. The customer returned later and presented a taped up 10x10 cardboard cube box for shipping. When the employee asked for the sender and recipient information, the customer provided a phone number he obtained from his cell phone. The phone number prompted the store's point-of-sale system to populate the transaction with a pre-existing customer profile which included sender and recipient information. The sender's information appeared as Annie SMYTHE, 3306 N Starr St Anchorage, AK 99502 and a sender's telephone number of 818-359-3176. The recipient's information appeared as Jazmine TONEY 6300 Variel Ave Apt 401 Woodland Hills, CA-91367-2612. On seeing the sender's name as "Annie SMYTHE", the employee questioned the customer. The customer was unfamiliar with the name Annie SMYTHE but explained that his brother had told him to use the phone number which would prompt the sender / recipient information on record. When the employee asked the customer to describe the contents, the customer stated that the parcel contained a candle. The employee recognized the sender / recipient information as previously being used by a white girl who had shipped two cube style parcels to the Woodland Hills address. When employee told the customer that he had missed the cutoff for Next Day Air delivery to Woodland Hills and that the parcel would not depart Anchorage until Monday, 7/3/17, the customer stated that he needed to call his brother, as he wanted the parcel to arrive the next morning. The customer left the parcel on the counter and stepped out of earshot while making a call from his cell phone. After concluding the call, the customer took the parcel and departed the store. Employee considered the transaction as suspicious and notified her managers of her concerns, who in turn called me.

15. Employee stated that she had recognized the customer from 4 or 5 previous purchases of cardboard cube style shipping boxes as well as

one previous instance wherein the customer had shipped a "fish box" to an address in Seattle. Employee stated that the customer pays in cash. Employee described the customer as a bald black male, aged in his mid-30's to 40's, 5'11 in height, of average build, and wearing black rim glasses and a beanie style hat. Employee reported that the customer drives a white Ford Explorer, 2005 or 2006 model. Employee provided me with records of four previous parcel shipments under the same sender / recipient information. All four of the previous parcel records listed Annie SMYTHE of 3306 N Starr St Anchorage as sender and Jazmine TONEY of 6300 Variel Ave apt 401 Woodland Hills, CA as recipient.

16. I reviewed the shipping records for the four previous parcels and learned as follows:

    * On 2/27/17, a 10x10 cube parcel weighing 4.1 pounds was shipped via 2nd Day with the same sender / recipient information. This parcel bore tracking number 1Z377FF60234339644, was described as containing a toy, and cost $59.61 to ship.

    * On 3/24/17, an 11x11 cube parcel weighing 4.9 pounds was shipped via Next Day Air with the same sender / recipient information. This parcel bore tracking number 1Z377FF64436671247, was described as containing "home décor" and cost $120.84 to ship.

    * On 4/25/17, a 10x10 cube parcel weighing 6.1 pounds was shipped via 2nd Day with the same sender / recipient information. This parcel bore tracking number 1Z377FF60201722611, was described as containing a toy, and cost $59.61 to ship.

    * On 5/22/17 an 18x13x11 parcel weighing 11.45 pounds was shipped via 2nd Day with the same sender / recipient information. This parcel bore tracking number 1Z377FF60203662718, was described as containing toys, and cost $76.82 to ship.

17. After talking to the employee, I left the store. I consulted a street map of Anchorage and did not find a "3306 N Starr Street". I then drove to the intersection of North Star Street and 36th Avenue in Anchorage. I drove North on North Star from 36th Avenue and noted the address numbers descended from 3506 to 3400 at the termination of North Star Street. I then drove to the intersection of North Star Street and 32nd Avenue and observed the address numbering resumes at 3200 and descends. I did not locate an address of 3306 North Star Street, nor did I find record of the address of "3306 N Starr St" in Anchorage. Based on my training and experience, I know it is common for drug traffickers to use nominees and / or fictional names and sender addresses as it adds a layer of insulation between themselves

and their crimes, to include when shipping drug parcels as well as parcels containing drug proceeds.

18. On Wednesday, 7/5/17, I learned that on Monday, 7/3/17, a black male and a younger white female entered another express parcel shipping store location and shipped an 11x11 cube parcel via Next Day Air using the sender's information as Annie SMYTHE 3306 N Starr St Anchorage, AK 99502 with a telephone number of 818-359-3176 and the recipient's information as Jazmine TONEY 6300 Variel Ave Apt 401 Woodland Hills, CA 91367-2612. The parcel bore tracking number 1Z3V8F161330776812, was described as containing a rice cooker, and cost $86.62 to ship. Disappointed, I asked the manager to notify me in the event of future parcels shipped under the "Annie SMYTHE" name.

19. During this investigation, the shipping company provided me with records of parcel shipments associated to the customer profile of "Annie SMYTHE" and/or utilizing the telephone number of 818-359-3176 since 1/1/16. I reviewed these records and learned that between 10/27/16 and 8/1/17, twenty parcels had been shipped from Anchorage using the name "Annie SMYTHE" as sender to Jazmine TONEY at the 6300 Variel Avenue address in Woodland Hills, CA. These parcels were variously described as containing food processors, a rice cooker, a blender, an air fryer, a microwave steamer bowl, clothing, and toys.

20. Based on my training and experience, I know that when shipping controlled substances and drug proceeds, drug traffickers and money launderers are fond of concealing contraband inside devices with cavities such as rice cookers, crock pots, toaster ovens, steamers, food processors, blenders, thermos bottles and karaoke speakers.

21. During this investigation, an administrative subpoena was served on the AT&T, the service provider for the telephone number 818-359-3176. This number is listed as sender "Annie SMYTHE's" number on the above parcels. AT&T responded to the subpoena. AT&T's response identified the subscriber for the number as Brandon GLASGOW, of 6300 Variel Avenue apt 401, Woodland Hills, CA. The name Brandon GLASGOW is significant in that Brandon GLASGOW was the name appearing as the recipient on a UPS parcel seized by D.E.A. in Anchorage on 8/11/15. The sender of the parcel was listed as Vernell GLASGOW, 3306 Cope St Anchorage AK. After a positive indication on the parcel by a canine trained in the detection of the odor of controlled substances, a search warrant was obtained for the parcel. Search of the parcel yielded $12,000.00 in suspected drug proceeds which were hidden w/in a toaster oven. The currency was further contained in layers of vacuum sealed plastic, carbon paper, and duct tape. The sender's address of

3306 Cope Street is suggestive of Annie SMYTHE's address of 3306 N. Starr.

22. During the afternoon of 8/31/17, I again heard from one of the managers of the express shipping stores. Manager told me that she had waited on a female customer "Annie SMYTHE" and that the customer had placed a parcel containing a $100 meat grinder for shipment to the previous Variel Avenue address, paying the shipping fee of $86.98 in cash. Manager provided me with an image of the shipping label for the parcel. The parcel label bears tracking number 1Z3V8F16PW31634635 and lists the parcel weight as 12 pounds. The sender's information read as Annie SMYTHE 3306 N Starr Anchorage AK 99502, with the telephone number of 818-359-3176. The recipients' information read as Jazmine TONEY apt 6300 Variel Ave Woodland Hills CA 91367-2612. Manager told me the parcel remained at the shipping store, as it had not yet been collected for transport to the shipping hub where it would eventually be loaded onto an aircraft for shipment to California.

23. After speaking to the manager, I drove to the shipping store in question. Manager showed me the parcel. I saw it is a brown cardboard box, with dimensions of 12 inches by 12 inches by 9 inches. I saw that with the exception of one small length, the seams of the parcel are sealed with clear tape, and that the parcel bears stickers designating it as Saturday Delivery. Manager told me that when the female customer brought the parcel into the shipping store, it was already sealed. Manager described the customer as a woman of mixed race, possibly "Samoan/Native" or "Hispanic", of heavy build, 5'3 to 5'4 in height, aged late 30's to early 40's, with brown shoulder length hair. Manager reported that when asked for the address information, the female customer showed manager an image on her cell phone which was a photograph of an earlier shipping label bearing the "Annie SMYTHE" sender info and Jazmine TONEY recipient information. The female customer elected Second Day Air, with Saturday delivery, and paid the shipping charges of $86.98 in cash. The customer asserted that the parcel contained a meat grinder and valued it at $100.00. Manager told me that after paying the shipping charges, the female customer left the store and departed the lot as driver of a grey Mercedes with Alaska license FSY-953. APSIN shows FSY-953 is a blue Mercedes registered to a woman named Srisuda Ali MATTHEWS, at 4010 Westland Drive in Anchorage. APSIN shows MATTHEWS as 5'5 tall, weighing 185 pounds and born in 1959. Further, MATTHEWS current AK OL photograph depicts her w/ shoulder length dark hair.

24. I have previously interdicted parcels found to contain either drugs or drug proceeds wherein the customer paid shipping charges which approached or exceeded the value of the declared contents.

25. After speaking with the manager, I left the shipping store. I contacted the security director for the shipping company. I relayed the above information and my suspicion that the parcel contained drug related contraband. Director agreed to make the parcel available for a drug detection canine sniff at the shipping hub after being collected from the store by the company truck. I then contacted AST Investigator Joel Miner, who is a trained canine handler. Miner's canine partner is a Belgian Malinois named "Mocha". I told Miner about the parcel. Miner agreed to meet me at the shipping hub for the purpose of conducting a sniff of the parcel. Later that afternoon, the security director notified me that the parcel had arrived at the hub and would be available for a canine sniff. Miner and I went to the hub where we met the security director. Security director showed us the parcel. I confirmed the tracking number and the sender / recipient information. I asked Miner to have "Mocha" sniff the parcel for the presence of the odor of controlled substances. After doing so, Miner told me that Mocha did not give a positive indication on the parcel. Based on my training and experience, I know that there are several reasons why a drug detection canine may fail to indicate to the odor of controlled substances emitting from a parcel despite the fact that the parcel contains controlled substances or proceeds from the sale of controlled substances. These reasons may include the fact that the controlled substances or proceeds are packaged in a manner which prevents the odor of controlled substances from escaping the parcel. In the case of drug proceeds, an additional factor is the potential that the "dirty" (odor laden) drug proceeds have been exchanged for clean bank circulated currency. Another factor is the brevity of the period of elapsed time during which the controlled substances or proceeds have been contained within the parcel. A brief period of time may limit the opportunity for odors to escape the parcel. An additional factor is the potential that the controlled substance is a controlled substance for which the canine has not been trained. Another factor is the potential dispersion of odors due to the movement of air present during the sniff.

26. On 9/1/17, I obtained a search warrant authorizing search of the parcel under case 3:17-mj-00366-DMS. Search of the parcel yielded a sealed USPS.com shipping box and packing beads. The USPS.com shipping box contained more packing beads and two sealed one-gallon size airtight metal cans. The airtight metal cans were each lined w/ carbon paper and contained a combined total of 16 packages of vacuum sealed and taped U.S. currency, with each individual package containing multiple increments of rubber banded U.S. currency. The currency was seized pending forfeiture proceedings. The currency was later determined to be $94,820.00. Further, on 9/5/17, I requested

that Miner have Mocha sniff the seized currency for the presence of
the odor of controlled substances.  After doing so, Miner informed me
that Mocha had given a positive indication for the odor of controlled
substances emitting from the currency.

**SEIZURE OF PARCEL CONTAINING $13,200.00 SUSPECTED DRUG PROCEEDS**

27. On Saturday, 11/11/17, I again heard from the manager of several
express parcel shipping stores located in Anchorage.  Manager told me
that one of her employees had called manager and reported recognizing
a store customer as a person whose driver's photo license I had
previously displayed (Harvelle Lee EARL and Vernell GLASGOW II were
among the photographs in question).  Manager told me that employee
reported the customer had brought a boxed toaster-oven into the store,
purchased a store-branded cardboard shipping box and packing peanuts,
and told employee that he would return later that day to ship the
toaster-oven after packaging it in the purchased store-branded
cardboard shipping box.

28. After speaking to manager, I called the store in question and
spoke to the employee who had waited on the customer.  In essence,
employee told me the customer came into the store carrying a boxed
Hamilton-Beach brand toaster oven and asked to purchase a store-
branded cardboard shipping box large enough to hold the boxed toaster-
oven.  Employee sold the customer a brown cardboard shipping box
measuring 20" x 12" x 12", as well as a bag of shipping peanuts.  The
customer explained that he would return later that day to ship the
toaster-oven after he had packaged it inside the purchased cardboard
shipping box, adding that he would "cut down" the toaster-oven box to
fit w/in the store-branded cardboard shipping box.  Employee described
the male as black w/ glasses and wearing a stocking cap.  Employee
stated that after the transaction, the male departed driving a newer
white Toyota Tundra pickup truck bearing Kendall Toyota dealer plates
in place of license plates.  Employee added that she recognized the
male as one of the subjects whose photographs I had previously
displayed to store employees (Harvelle Lee EARL and Vernell GLASGOW II
were among the photographs in question).

29. I went to the shipping store in question and spoke to the employee
in person.  Employee provided me with a copy of the transaction
receipt which showed the purchase of a 20 x 12 x 12 shipping box as
well as a bag of shipping peanuts, and that the transaction occurred
at 11:26.

30. At approx. 13:18 hours, I again heard from manager.  Manager told
me that manager had just heard from another of manager's employees,

from a second store. The employee told manager that a female customer
brought in parcel and requested quotes for shipping the parcel to Palo
Alto, California, providing a zip code of 94303. The parcel weighed
10.15 pounds, and smelled of "Febreze". Employee provided quotes for
various rates. However, on learning that she had missed the daily
cut-off for shipping next-day delivery, the female customer told
employee that she would return on Monday and ship the box then. The
female customer departed the store w/ the parcel. I drove to the
store in question and contacted the employee in person. Employee
described the female customer's parcel as a sealed brown cardboard
store-branded shipping box, measuring 20" x 12" x 12", and smelling
strongly of "Febreze". Employee stated that the female requested 2nd
Day Air, w/ no insurance, but declined to leave the parcel w/ the
shipping store after learning she had missed the cut-off time for
shipping 2nd Day Air. Female customer departed the store with the
parcel. Employee #2 provided me with a copy of the shipping quote. I
noted the quoted destination was Palo Alto, CA, with a zip code of
94303, and the actual weight showed as 10.15 pounds. Based on my
training and experience, I know that people engaged in the shipping of
controlled substances commonly used fragrances, drier sheets, coffee,
scented candles and other fragrant substances as a means of attempting
to mask the odor of controlled substances.

31. On 11/13/17, at approx. 10:55, I heard from manager again.
Manager told me that she had just heard from an employee at the second
store, who told manager that a female customer had just placed a brown
cardboard parcel with the store for shipping to California. Manager
forwarded me an image of the shipping label. I saw that the
destination was East Palo Alto, CA with a zip code of 94383-1915. I
went to the store in question and contacted the employee. Employee
told me the customer in question carried the sealed box into the store
and produced a piece of paper w/ the destination address. The female
customer asserted the parcel contained a "conventional oven" and
elected Next Day Air, and paid the shipping charge of $141.50 in cash
before departing as a passenger in a newer grey Toyota truck. The
sender's information was Janet MILLER 1211 Farrow Cir Ste A,
Anchorage, AK 99504, with a telephone number of 907-310-2965. The
recipient's information was listed as: Lavita WILSON 728 Camphor Way,
East Palo Alto, CA 94303-1915. The tracking number is
1Z377FF61320706010. Employee directed me to the parcel. I saw it was
a brown store-branded cardboard shipping box w/ dimension of 20" x 12"
x 12", and that all natural seams were taped. Employee told me she
expected the parcel to be collected from the store for transport out
to the sorting hub at approx. 13:30.

32. I left the store and telephoned the security director of the shipping company. I relayed the above information and my suspicion that the parcel contains drug related contraband. The director agreed to have security staff make the parcel available for a canine sniff at the shipping hub after being collected from the store by the company truck in the normal course.

33. That afternoon, I heard from a member of security staff for the shipping company who advised the parcel was present at the sorting facility and would be available for a canine sniff. AST Investigator Joel Miner and I met security staff at the sorting facility. Miner brought his scent detection canine "Mocha". At the sorting facility, security showed us the parcel. I confirmed the sender / recipient info and the tracking number on the parcel. I asked Miner to have "Mocha" sniff the parcel for the presence of the odor of controlled substances. After doing so, Miner told me that "Mocha" had provided an indication for the presence of the odor of controlled substances coming from the parcel. I seized the parcel and took it to the Anchorage offices of the D.E.A. pending my application for a search warrant. That evening, I obtained a search warrant authorizing search of the parcel under case 3:17-mj-00488-DMS. Search of the parcel yielded packing peanuts and a cardboard box containing a toaster oven. I disassembled the toaster oven and found two square-shaped packages of U.S. currency covered in tape and carbon paper. Each package was found to contain vacuum sealed plastic packaging which further contained multiple bundles of rubber banded U.S. currency. The currency was later determined to be $13,200.00. The currency was seized pending forfeiture proceedings.

### SEIZURE OF PARCEL CONTAINING $65,830.00 SUSPECTED DRUG PROCEEDS

34. On 7/31/18, officer Dale Boothroyd, of the Ted Stevens International Airport Police Department telephoned T/F/O C. Miller regarding an airline passenger named Vernell GLASGOW w/ last minute one way travel booked from Anchorage, to Los Angeles, CA. Miller recognized the GLASGOW name as a subject under investigation in this case and turned the call over to me. I informed Boothroyd of GLASGOW's suspected involvement w/ drug proceeds and previous seizures of drug proceeds. I further told Boothroyd that it was likely that GLASGOW would be carrying drug proceeds to Los Angeles, CA and asked that Boothroyd watch GLASGOW for any suspicious activity on his arrival at the airport. I also asked that Boothroyd make note of the vehicle which GLASGOW arrived in, advising that it might be a white Toyota Tundra truck. I further told Boothroyd that Harvelle Lee EARL Sr. is an associate of GLASGOW's. Boothroyd agreed to contact me upon GLASGOW's anticipated arrival at the airport later that afternoon.

35. Later that afternoon, Boothroyd called me and advised that GLASGOW had been dropped off at the airport by Harvelle Lee EARL Sr. in a white Toyota Tundra, JKP-328. APSIN shows JKP-328 is leased to Srisuda Ali MATTHEWS, of 4010 Westlake Drive, in Anchorage. This is significant as Srisuda MATTHEWS is the registered owner of the Mercedes driven by the female customer after dropping off the parcel from which the $94,820.00 was seized.

36. Boothroyd further advised that GLASGOW had checked an insulated cardboard fish box as luggage. Boothroyd further advised that Harvelle Lee EARL Sr. had also entered the airport terminal on foot and was observed speaking w/ GLASGOW before GLASGOW entered the TSA screening line. Boothroyd further advised that after a positive indication on the fish box by a canine trained in the detection of the odor of controlled substances, GLASGOW was detained. Boothroyd further advised that GLASGOW consented to search of the fish box and that the fish box was then found to contain 6 sealed metal cans which contained an undetermined amount of U.S. currency. Group Supervisor S/A F. Moreman and I responded to the airport, arriving at approx. 15:32 hours.

37. On arrival at the airport, Moreman and I joined Boothroyd and others in an office maintained by law enforcement w/in the terminal. I observed Vernell GLASGOW II to be seated in a chair, handcuffed, while state and local investigators were counting the currency in GLASGOW's presence. I observed six airtight metal cans w/ lids, an insulated cardboard fish box and an undetermined amount of U.S. currency. I asked GLASGOW how much money had been contained in the metal cans. GLASGOW responded "I don't know,....you tell me". I told GLASGOW that the U.S. government would send GLASGOW a letter regarding the procedures for claiming the seized money and asked GLASGOW for a mailing address for that purpose. GLASGOW refused to provide me w/ a mailing address. The count revealed the undetermined currency to be $65,830.00. The currency was seized pending forfeiture proceedings.

### OBSERVATIONS OF HARVELLE LEE EARL DRIVING THE WHITE TOYOTA TUNDRA, JKP-328

38. On 8/4/18, at approx. 15:10 hours, I drove into the area of an address of record for Vernell GLASGOW II located at 2141 West 80th Avenue Apt. #2 in Anchorage. There were no vehicles present in the parking space marked #2. I noted the following vehicles were parked on the South and West sides of the building: GNT-409; KCB-612; JLM-868; JEL-549; GBZ-416; JLH-132; and JJN-829. None of these vehicles are known to be associated to this investigation.

39. I then drove into the area of the suspected residence of Srisuda Ali MATTHEWS, located at 4010 Westland Drive in Anchorage. I arrived at approx. 15:27 hours and saw Srisuda MATTHEWS's blue Mercedes, FSY-953 was parked in the driveway. This Mercedes is significant as this is the same Mercedes described by the clerk as driven by the female customer who presented the parcel from which the $94,820.00 was seized.

40. I then drove into the area of the suspected residence of Harvelle Lee EARL Sr., located at 3307 Cope Street #A in Anchorage. I saw a silver Nissan Frontier, FER-405 parked in the northernmost position under the carport. APSIN shows the silver Nissan Frontier is registered to Telisa Green FLENAUGH at 2812 Barnette Street #3 in Fairbanks.

41. Later that evening, I returned to the area of 3307 Cope Street #A, arriving at approx. 18:57 hours. The white Toyota Tundra, JKP-328 was now parked behind the silver Nissan Frontier. APSIN shows the white Tundra is leased to Srisuda Ali MATTHEWS at 4010 Westland Drive. A dark Dodge Durango, EHC-979 was parked at the edge of Cope Street, just north of the residence. APSIN shows the Durango is registered to a person not known to be associated to this investigation. I rounded the block, making a second pass of 3307 Cope Street at approx. 19:04 hours. A dark Mercedes Benz w/ bearing a license plate of "HUNTLY" had arrived and parked to the south of the silver Nissan. APSIN shows the Mercedes is registered to Maneerat HUNTLEY at 3307 Cope Street #B. Anchorage municipal property records show Maneerat HUNTLEY as owner of 3307 Cope Street, which is described as a 2-family residential building.

42. On 8/5/18, at approx. 09:24 hours, I drove into the area of 2141 West 80th Avenue Apt. #2. A gray Kia, JBS-180 was parked in space #2. APSIN shows this vehicle is registered to a subject residing at 2141 West 80th Avenue #2 whose involvement in this investigation, if any, is unknown. I noted the following additional vehicles parked on the South and West sides of the building, JKY-470; GTK-869; GBZ-416; JLH-132 and JLM-868. I then drove into the area of 3307 Cope Street #A, arriving at approx. 09:35 hours. The Tundra was parked directly behind the silver Nissan Frontier. The property owner's dark Mercedes was parked to the south. I returned to 3307 Cope Street #A that evening, arriving at approx. 19:17 hours. The white Tundra, JKP-328, the silver Nissan Frontier and the property owner's Mercedes were all present, as was a blue Ford Explorer bearing the license "FROMED". APSIN shows the blue Ford Explorer is registered to a person whose involvement in this investigation, if any, is unknown.

43. On 8/6/18, at approx. 06:59 hours, I drove into the area of the suspected residence of Harvelle Lee EARL Sr. located at 3307 Cope Street #A in Anchorage. I saw the Tundra was parked in the south portion of the driveway. The silver Nissan Frontier, the dark Dodge Durango EHC-979 and the property owner's Mercedes were also present. I later drove into the area of 2141 West 80th Avenue #2, arriving at approx. 09:01 hours. The gray Kia registered to space #2 was present in the space marked #2. I then drove into the area of Srisuda MATTHEWS' residence located at 4010 Westland Drive, arriving at approx. 09:15 hours. There were no vehicles present in the driveway.

44. I returned to the area of 3307 Cope Street #A, arriving at approx. 09:26 hours. The white Toyota Tundra, JKP-328 and the silver Nissan Frontier were both present, as was the property owner's Mercedes. I parked to the north to observe. At approx. 10:03 I saw a subject later identified as Harvelle Lee EARL Sr. walking from the direction of the carport to the Tundra. EARL wore a white tee shirt and had a tan garment draped over his shoulder. EARL opened the driver's door of the Tundra and reached into the cab before walking to the rear of the truck. EARL then returned to the cab and briefly got into the driver's seat before again walking away towards the carport. EARL then returned to the Tundra, got in, and reversed the Tundra from the driveway, departing north on Cope Street and West on 32nd Avenue. At the intersection of Spenard Road and Benson Boulevard, I positively identified Harvelle Lee EARL Sr. as the driver and only occupant of the Tundra. I noted EARL is bald and was wearing black rimmed eyeglasses, consistent w/ the description provided by the shipping store clerk of the customer who withdrew a parcel tendered under the name "Annie SMYTHE" after learning he had missed the daily cut-off for next day delivery. EARL drove the Tundra north on Spenard Road, crossing Benson Boulevard, crossing Northern Lights Boulevard, and was last observed continuing north on Spenard Road after crossing Fireweed Lane.

45. That afternoon, I returned to 3307 Cope Street #A, arriving at approx. 13:18 hours. The silver Nissan Frontier was the only vehicle present. I parked to the east to observe. My position provided a view of the top half of a stairwell ascending from the parking area to the second floor deck, but did not provide a view of the parking area on the west side of the building. At approx. 14:02 hours, I began seeing subjects on foot on the second story deck, and at 14:07, saw a female descend the stairs from the deck to the area of the carport. At approx. 14:16 hours, I saw a subject consistent w/ Harvelle Lee EARL Sr. in appearance and attire as he ascended the stairs from the area of the carport. Once on the second story deck, the subject

turned south and apparently entered an unseen door on the north side of the building. At approx. 14:30 hours, I saw Harvelle Lee EARL Sr., as he came into view on the deck and descended the stairs towards the area of the carport. EARL was now wearing white shorts and a gray sweat shirt and was speaking into a cell phone. I moved from my location to attempt to locate EARL in the Tundra. At approx. 14:33, I saw the white Tundra, JKP-328 travelling north on Spenard Road at Benson Boulevard. I positively identified Harvelle Lee EARL Sr. as the driver and only occupant of the Tundra. I followed EARL as EARL drove the Tundra to the Brown Jug liquor store located at 1203 West Northern Lights Boulevard, parking at approx. 14:34 hours. EARL paced back and forth on the sidewalk while in an animated cell phone conversation before entering the Brown Jug liquor store. EARL emerged from the Brown Jug liquor store at approx. 14:40 hours and departed driving the Tundra south on Spenard Road.

46. On 8/7/18 at approx. 06:55 hours, I drove into the area of 3307 Cope Street #A and saw the Tundra, JKP-328, the brown Dodge Durango, the silver Nissan Frontier and the property owner's Mercedes were all present in the parking area. I returned to the Cope Street address that night at approx. 22:49 hours. The silver Nissan Frontier and the property owner's Mercedes were the only vehicles present.

47. Harvelle Lee EARL's criminal history includes a federal conviction in the District of Alaska for possession of a controlled substance w/ intent to distribute from 2005.

**COURT AUTHORIZED VEHICLE TRACKERS ON WHITE TOYOTA TUNDRA, JKP-328**

48. On 8/14/18, I obtained a federal tracking warrant under case 3:18-mj-00440-DMS. The warrant authorized agents to apply a GPS tracking device to the white Tundra, JKP-328. Despite being leased to Srisuda Ali MATTHEWS, surveillance has attributed the Tundra, JKP-328 to Harvelle Lee EARL Sr.

49. I installed the tracker on the Tundra during the night of 8/15/18.

50. Aided by the tracker, investigators have conducted physical surveillance of the Tundra. That surveillance has identified Harvelle Lee EARL Sr. as operating the Tundra, and apparently spending nights at the residence of 3307 Cope Street #A. The surveillance has also yielded observations of EARL engaged in meetings w/ occupants of vehicles in parking lots in Anchorage, as well as multiple brief visits to residences in Anchorage. The vehicle meetings and the residential visits have been consistent w/ drug deals. In addition to physical surveillance, I have reviewed data from the tracker. The

data has shown multiple brief visits to residences as well as multiple brief stops in commercial parking lots.

**BRANDON GLASGOW's PRESENCE IN ANCHORAGE, USE OF WHITE TOYOTA TUNDRA, JKP-328 TO SHIP $9,500.00 SUSPECTED DRUG PROCEEDS**

51. On the morning of 8/22/18, I reviewed data from the tracker from the previous night. The data showed the Tundra arrived on the ramp of Ted Stevens Int'l Airport on the morning of 8/22/18 at approx. 04:16 and departed at approx. 04:20 before travelling back to the area of 3307 Cope Street. Review of airport security footage and flight manifests for the time period in question determined that Brandon GLASGOW arrived in Anchorage on Alaska Air flight #193 from Los Angeles that morning. Security footage showed the apparent image of Brandon GLASGOW wearing a black hooded sweat shirt w/ San Francisco 49rs' graphics as he made his way from the gate out to the arrivals ramp.

52. On the morning of 8/23/18, data from the tracker indicated the Tundra departed the area of 3307 Cope Street at approx. 07:43 hours. After a brief stop in the area of a residence on 33rd Avenue, the Tundra returned to the area of 3307 Cope Street. After a stay at Cope Street, data showed the Tundra to travel east across Anchorage where it made a stop in the area of 8120 Peck Avenue. The Tundra then travelled to the Walmart store located on DeBarr Road, where it remained until approx. 11:01. The data then showed the Tundra to travel to the Costco Store on DeBarr Road and then back to 3307 Cope Street, arriving at approx. 11:24.

53. At approx. 11:31, Tundra was again underway from 3307 Cope, arriving in the area of an express parcel shipping store located in the area of 34th & C Street. After a brief stay, the Tundra departed. I went to the store and inquired of staff about any express parcels placed for shipment to CA or WA during the time frame in question. No suspicious parcels were identified, and I departed the store.

54. At approx. 12:34, I received tracker data that showed the Tundra to arrive in the area of a second express parcel shipping store, this one located Dimond Boulevard. I drove to the store in question, arriving at approx. 12:51. I learned that a male customer had presented a "Next Day Air" parcel for shipment to Simi Valley, CA during the period corresponding to the Tundra being present in the area of the shipping store. Staff showed me the parcel.

55. The parcel is a white rectangular cardboard shipping box measuring approx. 21" by 15" by 11" and weighing approx. 9 pounds. The parcel bears tracking number 1Z0A648R2421238426. The sender's information

appears as: David WILLIAMS 20703 Blackhawk St Chatsworth CA 91311, with a telephone number of 818-532-8822. The recipient information appears as Jasmine SMITH BR Merchant Service 4680E Los Angeles Ave Ste B Simi Valley CA 93063-3471 Business. I noted the name "Jasmine SMITH" to be reminiscent of the name "Jazmine TONEY", used on previous parcels encountered in this investigation.

56. Staff described the male customer as a black male, aged in his late 20's, 5'6 tall, of unremarkable build, w/ a shaved head, and wearing a black hooded sweatshirt w/ graphics. Staff reported that the male initially asked whether he had missed the daily cutoff for next day air delivery, and also asked how long the parcel would sit in Anchorage before getting underway to CA. Staff reported that the customer obtained the recipient address from his cell phone writing it on a slip of paper. Staff reported that the male elected "Next Day Air" and paid the shipping charge of $166.14 with cash, including a $100.00 bill, and noted that he had additional $100.00 bills. The customer asserted the parcel contained "equipment". I showed the employee who waited on the customer the CA OL image of Brandon Lavell GLASGOW. The employee identified Brandon Lavell GLASGOW's image as that of the customer. Manager told me she expected the parcel would be collected shortly by company truck for transport to the shipping hub located at the Ted Stevens Int'l Airport.

57. I left the store and called the security director for the shipping company. I relayed the above information and my suspicion that the parcel contained drug related contraband. The director agreed to make the parcel available for a canine sniff at the shipping hub after being collected from the store by the company truck in the normal course.

58. I spoke to officer Catherine Scott, of the Ted Stevens International Airport Police Department. Scott is a trained canine handler. Scott's canine partner is a Belgian Malinois named "Skye". I told Scott about the parcel. Scott agreed to meet me at the shipping hub for the purpose of conducting a sniff of the parcel. After hearing from the security director that the parcel had arrived at the hub, Scott and I went to the shipping hub. We were met by the security director, who showed us the parcel. I confirmed the tracking number and the sender / recipient information. I asked Scott to have "Skye" sniff the parcel for the presence of the odor of controlled substances. After doing so, Scott told me that "Skye" had provided an indication for the presence of the odor of controlled substances coming from the parcel.

JAN 27 2019

59. I seized the parcel and took it to the Anchorage offices of the D.E.A. pending my application for a search warrant. That evening, I obtained a search warrant authorizing search of the parcel under case 3:18-mj-00451-DMS. The parcel contained $9,500.00 U.S. currency hidden w/in individual diapers further contained w/in a case of Pampers diapers.

**CONTROLLED DELIVERY of PARCEL CONTAINING 1,820 GRAMS of METHAMPHETAMINE, IDENTIFICATION OF HARVELLE LEE EARL SR. AS SHIPPER**

60. During this investigation, I learned as follows from USPIS S/A Andrew Grow: On 8/9/17, Priority Mail Express Parcel EL795259534US was identified by a Postal Inspector Andrew E Grow, Jr., addressed to an individual (hereinafter referred to as RECIPIENT) at "2238 Wilson St, Fairbanks, AK 99701" sent from "Greg Burnett, 2602 70th Ave W #B, Tacoma, WA, 98466."

61. On 8/9/17, Federal Search Warrant 3:17-MJ-00329-DMS was obtained and executed by Postal Inspectors. The parcel contained approximately 1,820 grams of a white crystalline substance that field tested positive for methamphetamine located inside a taped vacuum sealed bag, wrapped in carbon paper and padded with crown royal bags, placed inside a Mrs. Fields tin box that was glued shut. This was all wrapped in a towel and placed inside a Priority Mail medium flat rate box that was wrapped in a towel and placed in the exterior cardboard "Ready-Post" box with foam packing peanuts. A NIK field test was performed on the white crystal substance resulting in a positive reaction for methamphetamine.

62. As a result of the seizure on 8/9/17, Order Number 3:17-MJ-00336-DMS was obtained from United States Magistrate Kevin F. McCoy, Anchorage, AK, authorizing the installation and monitoring of an electronic alerting device and electronic tracking device in the parcel and recovery of these devices by entry of premises where the parcel is opened.

63. Law enforcement officers removed the original 1,820 grams of methamphetamine and inserted a .3-gram representative sample of this methamphetamine along with a sham product into the parcel along with three tracking and monitoring devices. One monitoring device was placed so it would emit a break-tone signal upon opening of the exterior box of the parcel. In addition a second monitoring device was placed on the inside lid of the Mrs. Fields tin box which was inside the interior medium flat-rate box to signal the opening of the flat-rate box. One GPS tracking device had the representative sample

of the seized methamphetamine taped to it and was placed inside of the sham inside the tin box.

64. At approximately 1:00 PM on 8/10/17, Postal Inspectors delivered the parcel to the recipients address, 2238 Wilson St, Fairbanks, AK, 99701. Inspector Kevin Horne posed as a United States Postal Service (USPS) mail carrier, and delivered the parcel to the recipient's address. Inspector Horne spoke to a young boy who said his grandfather was sleeping and to leave the parcel on the front porch. Alaska State Trooper (AST) Angela Womack noted a black Chevrolet Equinox bearing Alaska license plate GWH283 was parked outside of the residence. This vehicle is registered to a subject at the recipient's address.

65. Surveillance teams set up around 2238 Wilson St, Fairbanks, AK 99701 and monitored the GPS tracking and the two monitoring devices. At approximately, 1:44 PM officers stated they lost the beeper tone from the parcel. Officers drove past 2238 Wilson St, Fairbanks, AK, 99701 and observed the parcel and black Chevrolet Equinox were no longer at the residence.

66. At approximately 1:50 PM, the tracking device showed the parcel at 23rd and Lathrop St. inside the apartment building, later identified as 1640 23rd Ave Apt. C, Fairbanks, AK 99701.

67. At approximately 1:52 PM, when Officers got close to 1640 23rd Ave Apt. C, Fairbanks, AK, 99701 they heard the electronic monitoring device emitting the break-tone, indicating that the parcel had already been opened. It was noted that a black male later identified as Kejuan GADIS and white female later identified as Tabitha TITTLE were outside of the house. In addition, a vehicle matching the black Chevrolet Equinox, later identified as the same vehicle from 2238 Wilson St, Fairbanks, AK 99701, was parked outside of 1640 23rd Ave Apt. C, Fairbanks, AK 99701.

68. Officers and agents made entry into the subject address approximately 5 minutes after they first heard the break-tone. They then executed the beeper Order 03:17-MJ-00336-DMS on 1640 23rd Ave Apt. C, Fairbanks, AK 99701. When officers approached the building they encountered GADIS and TITTLE outside of the building, both were secured. GADIS stated to officers that RECIPIENT had just showed up and went upstairs with a postal package.

69. Officers called out for anyone inside the building to come out. At this time RECIPIENT exited the building with TITTLE's juvenile son. Officers then made entry and located the parcel upstairs in a bedroom on the floor of the closet.

70. RECIPIENT and the juvenile male were placed in AST Womack's vehicle. RECIPIENT stated she orders a lot of stuff from EBay, but the mail she received today was not what she had ordered; she did not even know what it was. RECIPIENT also said that TITTLE and her boyfriend, GADIS, were not involved.

71. It was learned that RECIPIENT and TITTLE both live at 1640 23rd Ave Apt. C, Fairbanks, AK 99701. Both TITTLE and GADIS were asked which bedroom was RECIPIENT's and they indicated to the bedroom where the Subject Parcel was found. In addition, in that bedroom was US mail in RECIPIENT's name.

72. Postal Inspectors then checked TITTLE and GADIS hands and clothing for clue spray with negative results. Postal Inspectors and Officers then checked RECIPIENT for clue spray and pictures were taken. Officers were not certain if clue spray was on RECIPIENT's hands, but photos of her hands indicated there was. Postal Inspectors and Officers later searched RECIPIENT's hands at the AST barracks in a dark room with a blue and purple black light and confirmed there was clue spray on her hands and clothing.

73. Prior to leaving the residence, Officers Mirandized RECIPIENT and asked her if she understood her rights. RECIPIENT invoked her rights to have a lawyer present. At that point no additional questions were asked.

74. While RECIPIENT was being prepped to be transported to AST office, AST Patrick Nelson told her he understood she asked for a lawyer and wouldn't be asking her any questions, he just wanted to recover the equipment from the box. RECIPIENT stated, in the presence of AST Nelson and AST Aaron Mobley, all the pieces of the parcel were in her bedroom, and that the monitoring beacon was hidden behind a picture frame on her dresser.

75. RECIPIENT gave consent to search her room at 1640 23rd Ave Apt. C, Fairbanks, AK 99701, and signed a Waiver of Search form. In her room Postal Inspectors and Officers recovered a crown royal bag containing a digital scale with a white powdery substance, later identified as cocaine, from the top left drawer of the nightstand, $1,000.00 in US currency from inside a makeup case, and a Beretta 9mm firearm with serial number U16908Z from the shelf in her closet. The parcel's outer and inner boxes were located side by side on the closet floor. Inside the inner box were a blue towel and a Mrs. Fields tin box. Inside the Mrs. Fields tin box was the sham containing the tracking device and representative methamphetamine sample. The monitoring beacon that was originally placed inside of the Mrs. Fields tin box

was not present. That beacon was found on top of RECIPIENT's dresser behind a picture frame with its battery pack unplugged from the beacon and with the batteries removed from the battery pack.

76. During a proffer with RECIPIENT on December 8, 2018, RECIPIENT stated that on July 31, 2017, she mailed Priority Mail Express parcel EL760849875US to Harvelle EARL for Antaeus GAY which contained $70,000.00 in U.S. currency. This parcel was sent to 8307 29th St W, University Place, WA 98466. RECIPIENT stated this parcel was payment for the methamphetamine inside of the seized parcel.

77. According to messages on RECIPIENT's cellphone, GAY told RECIPIENT to address Priority Mail Express parcel EL760849875US to "8307 29th st west Apt-A, University place, Washington 98466, Lynn earl." On RECIPIENT's phone is a photo of the shipping label and receipt from the U.S. Post Office for the shipment of Priority Mail Express parcel EL760849875US.

78. PI Grow obtained USPS security footage of the customer presenting the Subject Parcel for shipment. During RECIPIENT's proffer, PI Grow showed RECIPIENT the video of the subject parcel being shipped. RECIPIENT identified the male customer as EARL. RECIPIENT stated EARL is GAY's uncle who once lived in Fairbanks, AK. RECIPIENT was subsequently indicted and pleaded guilty to violating 21 U.S.C. sections 841(a)(1) and 841 (b)(1)(A) under a plea agreement. RECIPIENT, as a result of cooperation, is expecting a 5k departure and faces no mandatory minimum. In addition to RECIPIENT's federal drug conviction as described above, RECIPIENT's criminal history as reflected by APSIN includes a misdemeanor driving violation from 2009.

### EARL's APPARENT DEPARTURE FROM ANCHORAGE, SHIPMENT OF 22 POUND PARCEL FROM ANCHORAGE TO LAKEWOOD, WA P.O. BOX

79. On 9/5/18, USPIS inspectors learned from an Anchorage postal employee that Harvelle EARL shipped a large parcel from Anchorage to an address in Washington on 8/27/18. Postal inspectors eventually identified the parcel in question as a 22 pound express mail parcel which had been shipped to P.O. box 97032, in Lakewood, WA. The postal forms establishing the P.O. box rental identify Vernell GLASGOW and Harvelle EARL as authorized users of the P.O. box, which was originally rented in 2005.

80. On 9/5/18, USPIS inspectors learned from an Anchorage postal employee that Harvelle EARL shipped a large parcel from Anchorage to an address in Washington on 8/27/18. Postal inspectors eventually identified the parcel in question as a 22 pound express mail parcel which had been shipped to P.O. box 97032, in Lakewood, WA. The postal

JAN 27 2019

forms establishing the P.O. box rental identify Vernell GLASGOW and
Harvelle EARL as authorized users of the P.O. box, which was
originally rented in 2005.

81. Commencing the afternoon of 9/8/18, physical surveillance and data
from the tracker showed the white Tundra, JKP-328 as parked in front
of 3307 Cope Street, having last moved on that date at approx. 16:30
hours. The Tundra remained stationary at the 3307 Cope Street address
until the morning of 10/10/18.

### EARL's 10/10/18 RETURN TO ANCHORAGE

82. On multiple occasions between 10/10/18 and 10/30/18, surveillance
was conducted wherein Harvelle EARL was positively identified driving
the white Tundra, JKP-328 in Anchorage. Those surveillances included
the night of 10/23/18 when EARL was observed getting into the Tundra
w/ a carry-out food order from a restaurant. EARL remained parked in
the restaurant lot for several minutes before a white Impala arrived
and parked adjacent to the Tundra. EARL was once previously observed
meeting with the driver of this Impala in a public parking lot under
circumstances consistent w/ a drug transaction in its brevity and
location. The male driver from the Impala then joined EARL in the
Tundra for approx. 16 minutes before returning to the Impala and
departing. EARL was then followed to a nearby WalMart store where he
purchased a boxed "Copper Chef" deep dish copper baking pan. EARL
loaded the boxed copper baking pan into the rear of the cab of the
Tundra. EARL then drove the Tundra from the lot. Investigators
followed EARL in the Tundra north across Anchorage, with the Tundra
last seen turning north onto Cope Street from 36th Avenue towards 3307
Cope Street. At approx. 22:28 hours, I monitored data from the
tracker indicating the Tundra had arrived in the area of 3307 Cope
Street. Regarding the "Copper Chef" deep dish baking pan, based on my
training and experience, I know that when shipping controlled
substances and drug proceeds, drug traffickers and money launderers
are fond of concealing contraband inside devices with cavities such as
rice cookers, crock pots, toaster ovens, steamers, food processors,
blenders, thermos bottles and karaoke speakers.

### PURCHASE OF FISH BOX, $14,000.00 in POSTAL MONEY ORDERS

83. Surveillance was conducted in this case on 10/30/18. During this
surveillance, investigators watched Harvelle Lee EARL drive the Tundra
to a tire shop where he took on a passenger. The passenger was
tentatively identified as Derrick IVORY. EARL and IVORY spent approx.
an hour together before separating. After separating, investigators
followed IVORY as he drove a vehicle to the parking lot of the liquor

store located at Northern Lights Boulevard and Lake Otis Parkway. I watched IVORY approach the driver's window of a black Toyota 4Runner and hand the driver an item through the open driver's window before returning to the vehicle IVORY had been driving. Based on my training and experience, the location and brevity of the exchange was consistent w/ a drug transaction. IVORY's criminal history as reflected by APSIN includes a felony drug conviction from 1998 and extensive misdemeanor property crimes and driving offenses.

84. On the morning of 11/1/18, data from the tracker indicated that the white Tundra departed the area of 3307 Cope Street #A at approx. 04:48 hours and travelled to the Ted Stevens International Airport, arriving at approx. 04:52. I later learned the Tundra's presence at airport coincided w/ the arrival of Brandon Lavell GLASGOW on a flight from Los Angeles, CA to Anchorage at approx. 04:46 hours. Airport security footage captures the image of Brandon GLASGOW being met by a white Tundra and placing luggage in the cab of the Tundra before entering as a passenger and departing. Data from tracker shows the Tundra departed the airport and returned to the area of 3307 Cope Street #A at approx. 05:02.

85. That same morning, at approx. 09:52 hours, I was driving into the area of 3307 Cope Street #A when I encountered Harvelle Lee EARL. EARL was driving the Tundra north on Northstar and east on 30th Avenue. EARL was alone in the Tundra. I followed loosely as EARL drove the Tundra across Anchorage to the area of 5218 Taku Drive #3, where at 10:06 hours, I saw the Tundra parked unoccupied to the east of the building. I remained in the area to observe.

86. At approx. 10:31, data from the tracker indicated the Tundra was departing from the area of 5218 Taku Drive #3. I then saw the Tundra travelling south on Boniface Parkway and again followed loosely as the Tundra travelled across Anchorage, returning to the area of 3307 Cope Street #A at approx. 10:47 hours.

87. At approx. 10:53 hours, data from the tracker indicated the Tundra was departing from the area of 3307 Cope Street #A. I followed loosely as the Tundra travelled to the area of the Monster Car Wash located at 2195 West Dimond Boulevard. I positively identified Harvelle EARL as he drove the Tundra from w/in a bay of the car wash. I positively identified Brandon Lavell GLASGOW as EARL's passenger in the Tundra. EARL was wearing a yellow sweatshirt w/ matching yellow pants that had areas of white and black. Brandon GLASGOW was wearing a grey sweatshirt w/ matching pants. I followed EARL and GLASGOW as they travelled in the Tundra to the Costco store located at 330 West Dimond Boulevard and then to the area of the Dimond Center.

88. At approx. 13:21, I monitored data from the tracker indicating the Tundra had arrived in the area of the Post Office located at 4141 Postmark Drive. I notified USPIS S/A Andrew Grow of EARL and Brandon GLASGOW's presence at the Post Office and drove into the area. I arrived as the Tundra was departing. S/A Grow contacted postal staff and learned that two subjects consistent w/ EARL and Brandon GLASGOW had each purchased $2,000.00 in postal money orders, and that each subject had a large stack of cash, and had departed in a white truck. T/F/O D. Boothroyd joined me at approx. this point. Boothroyd and I followed EARL and Brandon GLASGOW loosely as they travelled in the Tundra into the downtown area of Anchorage, where Boothroyd saw EARL and GLASGOW on foot. We then followed EARL and GLASGOW to the Lucky Wishbone restaurant, where I again positively identified Harvelle EARL and Brandon GLASGOW, w/ GLASGOW now driving the Tundra. We followed EARL and GLASGOW as they travelled in the Tundra from the Lucky Wishbone to the area of the Post Office located at 800 Ingra Street, arriving and parking at approx. 14:22 hours. I saw EARL and GLASGOW come out of the Post Office each carrying what appeared to be slips of paper. I again notified S/A Andrew Grow. After contacting postal staff, S/A Grow told me that two subjects consistent w/ EARL and Brandon GLASGOW had each purchased $2000.00 in postal money orders.

89. Boothroyd and I followed EARL and Brandon GLASGOW in the Tundra as they travelled to the area of the Northway Mall, which they briefly entered on foot. At approx. 14:41 hours, I watched EARL and Brandon GLASGOW as they came out of the mall and returned to the Tundra. We followed EARL and Brandon GLASGOW as they drove to the Post Office located at 801 Northway Drive. I again notified S/A Grow of their presence at the Post Office. After speaking w/ postal staff, S/A Grow told me that two subjects consistent w/ EARL and Brandon GLASGOW had each purchased $2,000.00 in postal money orders.

90. Boothroyd and I followed loosely as EARL and Brandon GLASGOW travelled from the Northway Post Office and drove in the Tundra to the Muldoon Post office located at 2420 Muldoon Road, arriving at approx. 15:11. Boothroyd and I arrived in the area of the Muldoon Post Office at approx. 15:12 hours, and saw the Tundra parked on the south side of the Post Office. We watched EARL and Brandon GLASGOW as they emerged from the Post Office and got into the Tundra. GLASGOW was still wearing the grey sweat suit, but had added a red knit hat. S/A Andrew GROW informed me that after speaking to staff, subjects consistent w/ EARL and Brandon GLASGOW had each purchased a postal money order in the amount of $1,000.00. At approx. 15:19 hours, GLASGOW and EARL departed in the Tundra. We followed GLASGOW and EARL to the area of 5218 Taku Drive #3, with data from the tracker showing the Tundra

arriving at approx. 15:34. I arrived in the area and at approx. 15:38, I saw Harvelle EARL descending the stairs from the second floor of the building and walk towards the parked white Tundra before going back up the stairs to door for #3. At approx. 15:46, I see a black female emerge from the door to #3 and descend the stairs from the second floor. The woman then departed in a black GMC Envoy, GWE-346. APSIN shows the Envoy is registered to a woman whose criminal history as reflected by APSIN includes felony drug convictions from 1999 and 1994. The 1994 felony drug conviction is accompanied by a felony weapons conviction as well.

91. At approx. 15:51, I saw Harvelle EARL and Brandon GLASGOW come out the door to #3 and descend the stairs to the alley, where the Tundra had been parked. Boothroyd and I followed EARL and Brandon GLASGOW in the Tundra to the "10th & M" seafood store located at 301 Muldoon Road. At approx. 16:24, I saw EARL and GLASGOW emerge from the store. EARL carried a large white rectangular fish box and a brown paper sack. This fish box was identical in appearance to the fish box seized from Vernell GLASGOW at the Ted Stevens Airport on 7/31/18, and which was found to contain $65,830.00 concealed in metal cans. EARL placed the fish box into the bed of the Tundra. Brandon GLASGOW entered the Tundra as passenger, w/ EARL as driver. We followed loosely as EARL and GLASGOW travelled back to 5218 Taku Drive #3. I arrived and saw the white Tundra, JKP-328 parked in the alley on the south side of the building. I watched EARL carry the fish box and the brown paper sack up the stairs. EARL tries the door knob and apparently finds it locked. EARL then knocks on the door. The door is eventually opened by someone from w/in and EARL carries the fish box and paper sack into #3. At approx. 16:37, I saw EARL come back out of #3 carrying the fish box. EARL placed the fish box back into the bed of the Tundra. EARL and GLASGOW departed the Taku Drive address in the Tundra. We followed loosely as EARL and GLASGOW traveled back to the area of 3307 Cope Street #A, where at approx. 17:01, Boothroyd saw EARL and GLASGOW ascending the stairs to #A, with GLASGOW now carrying the fish box. I later learned from S/A Grow that at least one of the postal money orders was subsequently deposited into a bank account of Brandon GLASGOW.

92. Surveillance was maintained in the area of 3307 Cope Street #A and the Tundra until approx. 20:30. During this period, Harvelle EARL and Brandon GLASGOW returned to the area of the Dimond Center and then went to a restaurant before returning to the Cope Street address, where at 18:19, I see two subjects consistent w/ EARL and GLASGOW ascend the stairs to the second story deck of 3307 Cope Street #A, w/ GLASGOW carrying what appears to be a carry-out food order. At

approx. 19:37 hours, data from the tracker indicated the Tundra was departing the area of 3307 Cope Street #A. Investigators followed the Tundra to the area of the 3240 Penland Parkway space #144. This address is the residence of Prentiss De Aun JONES. NCIC shows that in 1997 JONES was convicted and sentenced to 108 months incarceration and five years supervised release for distribution of a controlled substance in the District of Alaska. NCIC further shows JONES' probation was revoked in 2010, w/ another 18 months imposed. JONES' criminal history as reflected by APSIN includes felony drug convictions from 1997 and 2010. Surveillance was terminated at approx. 20:30. Later review of the tracker data indicated the Tundra eventually departed #144 and travelled to the area of 5218 Taku Drive #3 before returning to the area of 3307 Cope Street #A.

93. Based on my training and experience, I recognize the parcels described above, to include the fish boxes of 7/31/18 and 11/1/18, as well as the described purchase of postal money orders as consistent with efforts to move drug proceeds from Alaska to sources of supply located outside of Alaska.

INITIATION OF CELL PHONE PING

94. On 10/10/18, I obtained a search warrant under case 3:18-mj-00498-MMS. The warrant sought location data for an AT&T cell phone subscribed by Harvelle Lee EARL. I began receiving location data for EARL's cell phone on 10/11/18. Between 10/11/18 and 10/31/18, the location data showed EARL's cell phone to be located in Anchorage. On 10/31/18, the location data for EARL's cell phone shifted to Fairbanks, returning to Anchorage that night. I later learned EARL took a Raven Air flight from Anchorage to Fairbanks that day.

EARL's APPARENT 11/2/18 DEPARTURE FROM ANCHORAGE, SHIPMENT OF 11 POUND PARCEL FROM ANCHORAGE TO LAKEWOOD, WA P.O. BOX

95. During the morning of 11/2/18, location data for Harvelle EARL's cell phone shifted from Anchorage to the state of Washington. Further, as indicated above, the Tundra ceased movement on 11/2/18, having been left parked in front of 3307 Cope Street #A. Additionally, the cell phone ping has provided location data for EARL's cell phone as being in the area of University Place, Washington, to include the area of the intersection of 29th Street West and Sylvan Drive West, in University Place, Washington. Harvelle Lee EARL's residential address, as listed on his WA driver's license appears as 8307 29th St W, Apt. D, University Place, WA 98466-2703, and is located at this intersection. On 11/5/18, I learned from S/A Andrew Grow that on 10/15/18, Priority Mail parcel 9505 5115 2457 8298

2994 93 addressed to P.O. Box 97032 Lakewood, WA 98497-0032 was mailed
from Anchorage, AK 99501. This parcel weighed eleven (11) pounds
eleven (11) ounces, with postage in the amount of $39.45 paid in cash.
As previously noted, this P.O. box belongs to Harvelle EARL and
Vernell GLASGOW.

## EARL's PRESENCE IN ANCHORAGE BETWEEN 11/7/18 AND 11/16/18, AND APPARENT DEPARTURE

96. During the early morning hours of 11/7/18, I monitored location
data from EARL's cell phone indicating the cell phone had traveled
into the area of the SeaTac Airport and then to the area of the Ted
Stevens International Airport in Anchorage. Further, at approx.,
08:28 hours, I monitored data from the tracker previously installed on
the Tundra which indicated it had departed the area of 3307 Cope
Street #A and travelled to Kay's restaurant located on Spenard Road.
I drove into the area, and at 08:35, saw the Tundra parked in the
Kay's lot adjacent to the dark Dodge Durango, EHC-979. Physical
surveillance and data from the tracker show that during the period
between 11/7/18 and 11/16/18, Harvelle Lee EARL drove the Tundra to
and from the area of 3307 Cope Street #A, travelling in Anchorage and
visiting locations to include stops in proximity to 5218 Taku Drive #3
and Prentiss De Aun JONES' residence at the 3240 Penland Parkway #144.
Further, on 11/12/18, I positively identified Harvelle Lee EARL
driving the Tundra to the residence located at 7929 East 6th Avenue,
where a resident of the address joined EARL briefly in the cab of the
Tundra under circumstances I recognize as consistent w/ a drug
transaction in its location and duration. The resident in question
has extensive criminal history including convictions for illegal use
of a credit card, robbery and homicide from 1994.

97. Regarding the U.S. postal money orders purchased by Harvelle Lee
EARL and Brandon GLASGOW on 11/1/18, records from U.S.I.P.S. show
these money orders have been negotiated by Brandon GLASGOW, Kyla
TONEY, and a subject named Jevoni BUCHANAN on dates ranging from
11/3/18 through 12/5/18. BUCHANAN is the owner of a bank account into
which approx. $72,000.00 in cash was deposited in bank branch
locations in Anchorage, AK and from which approx. $69,000.00 was
withdrawn from branch locations in CA during the period from 1/17
through 12/17. Based on my training and experience, I recognize the
use of the BUCHANAN account as described above as consistent w/ drug
trafficker's efforts to move drug proceeds from Alaska to sources of
supply located outside of AK.

98. On 11/20/18, U.S.P.I.S. obtained a search warrant issued under
case 3:18-mj-00560-DMS. The warrant authorized search of a 13 pound

priority mail parcel which had been presented for shipment from Anchorage on 11/15/18 by Harvelle EARL to the P.O. Box in Lakewood, WA. Search of the parcel yielded clothing, with no items seized.

99. Physical surveillance and data from the tracker currently installed on the Tundra under authority of 3:18-mj-00539-DMS show the Tundra as parked in front of 3307 Cope Street #A for the period extending from the night of 11/16/18 until 12/12/18.

## EARL's PRESENCE IN ANCHORAGE BETWEEN 12/12/18 AND 12/21/18, AND APPARENT DEPARTURE

100. On the morning of 12/12/18, I reviewed data from the tracker indicating the Tundra departed the area of 3307 Cope Street #A during the previous night at approx. 00:39 hours and returned at approx. 01:28. I drove into the area of 3307 Cope Street #A that morning at approx. 07:07 hours. The white Tundra was among the vehicles in the driveway. I saw tire impressions in the overnight snow accumulation leading from the Tundra out to Cope Street, consistent w/ recent movement.

101. On 12/13/18, at approx. 08:53 hours, I drove into the area of the suspected residence of Harvelle Lee EARL located at 3307 Cope Street #A, in Anchorage. The white Tundra, the previously observed brown Durango EHC-979, the silver Nissan Frontier and the grey Ford Taurus were all present in the driveway.

102. Later that morning, I conducted a briefing regarding a planned surveillance of Harvelle Lee EARL. Those present included S/A's M. Burke, R. Rambo, M. Lathrop, M. Olsen, IRS S/A K. Pudge, T/F/O D. Boothroyd, and USPIS S/A A. Grow. As planned, the physical surveillance would be supplemented by data provided by a tracker previously installed on the Tundra. The driver's license photographs of Harvelle Lee EARL, Prentiss De Aun JONES, Prentiss Deaun JONES, Jr., Rayel Lamar SHOULDERS and Alonzo HILL were distributed during the briefing.

103. Data from the tracker indicated the Tundra had departed the area of 3307 Cope Street #A and travelled into the area of Kay's restaurant on Spenard Road before travelling east across Anchorage to the area of 5218 Taku Drive #3, arriving at approx. 11:58. At approx. 12:03, Boothroyd arrived in the area and saw the white Tundra was parked in the alley behind 5218 Taku Drive #3 w/ the engine running. At approx. 12:09, Boothroyd positively identified Harvelle Lee EARL as EARL got out of the white Tundra and ascended the stairs on the south side of 5218 Taku Drive. Boothroyd watched as EARL used a key to enter the door to 5218 Taku Drive #3.

JAN 27 2019

104. I assumed Boothroyd's position and at approx. 12:20, saw an older blue Chevrolet S-10 type Blazer arrive in the alley, parking behind the white Tundra. The Blazer was driven by a heavy white woman w/ blond hair. I watched as she ascended the stairs and entered 5218 Taku Drive #3. At approx. 12:36, I saw Harvelle EARL, the heavy blond driver of the Blazer and a woman resembling Viki Rae KELLY as they came out of the door to 5218 Taku Drive #3 and onto the deck. The heavy blond woman went down the stairs and departed driving the blue S-10 Blazer. EARL and the woman resembling Viki KELLY remained on the deck briefly. EARL then descended the stairs and departed driving the Tundra. The woman resembling KELLY went back inside 5218 Taku Drive #3.

105. Investigators followed EARL as he fueled the Tundra at Costco and then travelled west back across Anchorage to Spenard. In Spenard, EARL purchased a beverage before making a two minute stop at 3307 Cope Street #A and then drove the Tundra to the area of the World Wide Movers offices located at 7120 Hart Street, stopping at approx. 13:37 hours. S/A Pudge arrived in the area at 13:39, and saw the white Tundra parked to the south of the office building. Pudge briefly saw a subject wearing a red jacket approach the Tundra on foot. Pudge then saw the subject w/in the wingspan of the back door of the Tundra. The subject was short in stature. The subject then walked away from the Tundra, last seen walking towards the office building. The Tundra departed at approx. 13:44. I arrived and made note of the registration of several vehicles parked at the office. The vehicles included a blue Mercedes, FSY-953. APSIN shows FSY-953 is registered to Srisuda Ali MATTHEWS.

106. Investigators followed as EARL drove south on Arctic Boulevard and east on Dimond Boulevard to the Dimond Center, where at 13:52 Pudge saw EARL sitting in the cab of the Tundra, parked at the west end of the shopping center. At approx. 15:53, EARL was observed on foot walking back to the Tundra from the direction of the shopping center. From the Dimond Center, EARL drove to the Value Liquor store located at 601 West Dimond where he stopped and entered. Investigators followed EARL as he drove the Tundra back to the Spenard neighborhood, where at 16:16, the Tundra was last seen turning north onto Cope Street from 36th Avenue. At approx. 16:21 hours, I watched a subject consistent w/ Harvelle EARL as the subject ascended the stairs to the entry porch for 3307 Cope Street #A and turned towards the entry door, going out of sight. After several minutes, Grow drove past 3307 Cope Street #A. Grow confirmed the white Tundra, JKP-328 was parked unoccupied in the driveway and that the lights were turned

on inside 3307 Cope Street #A.  Investigators departed the area
shortly after Grow's observations.

107. At approx. 17:04 hours, data from the tracker indicated the white
Tundra, JKP-328 had arrived in the area of 3711 Casper Court.  I
arrived in the area at approx. 17:43 hours and observed the Tundra was
parked on the street in front of 3711 Casper Court.  Vehicles present
in the parking area for 3711 Casper Court included a blue Oldsmobile,
JES-871 and a red Buick, JEG-456.  At approx. 18:15, the lights on the
Tundra blinked as if unlocked from remote.  Harvelle EARL then walks
into sight from the direction of 3711 Casper Court and enters the
Tundra.  EARL is wearing the same distinctive yellow suit as when
observed earlier in the day.  EARL drives the Tundra to a nearby
liquor store where he enters and appears to make a purchase before
returning to 3711 Casper Court, again parking on the street in front
of 3711 Casper Court.  I then departed the area.

**VIKI RAE KELLY FLIES TO LOS ANGELES w/ INSULATED FISH BOX, 12/15/18**

108. On 12/15/18, I monitored data from the tracker installed on the
Tundra.  I saw the tracker showed the Tundra to have spent the
previous night in the area of 3307 Cope Street #A, having parked there
at approx. 22:39 and departed at approx. 09:14 hours the morning of
Saturday, 12/15/18.  Data showed the Tundra make a brief stop in the
area of the suspected residence of federal probationer Mayveline
Manalili ARRUIZA at 8291 Stratton Circle (ARRUIZA has previously been
identified as depositing $3,000.00 of Western Union money orders into
EARL's Wells Fargo account on 11/3/18).  The Tundra then travelled to
the area of 5218 Taku Drive #3, where it parked at 09:42 and departed
at 09:51.  From the Taku residence, the white Tundra travelled to East
High School before returning to the area of ARUIZZA's residence and
then returning to the area of 3307 Cope Street #A at 12:19.  Data
showed the Tundra next departed the area of 3307 Cope Street #A at
approx. 13:16, when it made a brief stop in the area of a Spenard pawn
shop before returning to the area of 3307 Cope Street #A where it
remained from approx. 13:22 until approx. 13:35.

109. At 13:35, the white Tundra departed the area of 3307 Cope Street
#A and travelled to the area of 3711 Casper Court, arriving at approx.
13:47.  The Tundra remained in the area of 3711 Casper Court for
approx. 15 minutes, departing at approx. 14:02.  Data showed the
Tundra to travel from the area of Casper Court to an Anchorage
restaurant before returning to East High school before returning to
the area of 5218 Taku Drive #3, arriving at 15:48.  Data showed the
Tundra to remain in the area of 5218 Taku Drive #3 for approx. 3
minutes, when it departed and travelled to the area of the 10th & M

Seafood store located at 301 Muldoon Road.  The Tundra remained
stationary at the 10th & M Seafood store from approx. 15:56 until
16:17, when it departed and traveled to the Wells Fargo bank branch
located 301 West Northern Lights Blvd.  The Tundra remained stationary
at the Wells Fargo bank for approx. 11 minutes before departing.  EARL
is known to have a Wells Fargo checking account and a Wells Fargo
savings account.  From the Wells Fargo bank, the Tundra returned to
the area of 3307 Cope Street #A, arriving at approx. 16:44.

110. Tracker data next showed the Tundra to depart the area of 3307
Cope Street #A at approx. 17:48, when it travelled to a Spenard
restaurant and then to the area of 6024 East 12th Avenue, where it
remained stationary for approx. 11 minutes.  The Tundra then travelled
to a south Anchorage residence where it remained for approx. 2 hours
before stopping at two convenience stores and returning to the area of
3307 Cope Street #A.

111. Data showed the Tundra next departed the area of 3307 Cope Street
#A at approx. 21:50 hours and travelled to the area of 5218 Taku Drive
#3, where it stopped for approx. 15 minutes.  From the area of 5218
Taku Drive #3, the Tundra travelled to the Ted Stevens Anchorage
International Airport, arriving on the departures ramp at approx.
22:39 and departing at approx. 22:48 hours.  Later examination of
airport security camera footage for the period corresponding to the
presence of the white Tundra at the airport revealed the image of a
white Toyota Tundra arriving and stopping on the departures ramp at
approx. 22:39.  A woman then walks from the direction of the Tundra
and enters the airport.  The woman appears to be Viki Rae KELLY.  The
woman is wearing a black back pack, and is carrying a black bag and
what appears to be an insulated fish-box.  The footage traces the
woman's route through the airport, where she is seen checking the
fish-box as luggage at the Alaska Airlines pod and eventually enters
the jet-way to board Alaska Airlines flight #150 to Los Angeles, CA.
The fish-box depicted in the security footage is consistent in shape
and dimensions with the fish-box seized from Vernell GLASGOW at the
Ted Stevens Airport on 7/31/18, and which was found to contain
$65,830.00 concealed in metal cans.  This fish-box is likewise
consistent in shape and dimensions with the fish-box acquired by
Harvelle EARL and Brandon GLASGOW from the 10th & M Seafood store on
11/1/18.

112. An administrative subpoena was later served on Alaska Airlines.
The subpoena sought records relating to travel by Viki Rae KELLY on
12/15/18.  Alaska Airlines responded w/ records showing that Viki
KELLY flew on Alaska Airlines flight #150 from Anchorage to Los
Angeles, CA on 12/15/18.  The records further indicated that KELLY

returned to Anchorage from Los Angeles the following day on Alaska Airlines flight #93. Further, Brandon GLASGOW was listed as the cardholder for the credit card used to pay for KELLY's airfare from Anchorage to Los Angeles, and Harvelle EARL was listed as the cardholder for the card used to pay for KELLY's flight from Los Angeles back to Anchorage.

### EARL's PURCHASE OF TWO INSULATED FISH BOXES, APPARENT DEPARTURE FROM ANCHORAGE, 12/20/18

113. During the afternoon of 12/20/18, I received data from the tracker indicating the white Tundra had arrived in the area of the 10th & M Seafood store located at 301 Muldoon Road. I drove into the area of the 10th & M Seafood Store arriving at approx. 12:24 hours. I saw the Tundra parked in front of the store w/ its parking lights on. At approx. 12:26, I saw and positively identified Harvelle EARL as he emerged from the seafood store carrying an insulated fish box. EARL carried the box to the rear of the Tundra and placed it in the bed. EARL then took what appeared to be the white styrofoam lid of the fish box and got into the cab of the Tundra. EARL wore a grey warmup suit. I watched as EARL departed driving the white Tundra southbound on Muldoon Road. I did not follow. Data from the tracker indicated the Tundra travelled to the area of 3307 Cope Street #A, arriving at approx. 12:47, and then departed at approx. 13:02 hours. That afternoon, I heard from USPIS S/A Grow. Grow told me that staff from an express shipping store located in Anchorage had called Grow and informed him that EARL had just purchased an insulated cardboard shipping box from the store.

114. Harvelle EARL is suspected to have departed Anchorage that night, as physical surveillance placed the white Tundra parked in the driveway of 3307 Cope Street #A from that time until EARL's apparent return to Anchorage on 1/24/19.

### 12/31/18 SURVEILLANCE OF 3240 PENLAND PARKWAY SPACE #144

115. On 12/31/18, I briefed a surveillance of the suspected residence of Prentiss De Aun JONES, located at the 3240 Penland Parkway #144. Those present included S/A B. Damon, T/F/O R. Pawlak, and IRS S/A K. Pudge. Driver's license images of Harvelle Lee EARL, Prentiss De Aun JONES, Prentiss Deaun JONES, Jr. and Alonzo HILL were distributed. After the briefing, investigators went into the area of 3240 Penland Parkway and the Northway Mall.

116. After briefing, I drove to the 3240 Penland Parkway #144 and saw there were no vehicles present in the driveway. I parked to the

north, with a view of the walkway which leads from the parking area of
3240 Penland Parkway #144 to the door of #144.

117. At approx. 11:40 hours, TFO Pawlak arrived at the Northway Mall
to conduct surveillance. TFO Pawlak proceeded to the parking area in
front of the Planet Fitness gym. TFO Pawlak parked and observed a
silver Ford Explorer with noticeable front end damage, slowly driving
through the parking lot. TFO Pawlak suspected the driver and sole
occupant of the vehicle was Alonzo HILL, who he recognized from the
driver's license images distributed during the briefing. TFO Pawlak
directly relayed his observations to S/A K. Pudge and at 11:53 hours,
requested an APSIN check of the vehicle which revealed HCC-138 is a
silver, 2005 Ford Explorer registered to Alonzo HILL. TFO Pawlak
observed the Explorer return and park next to a silver BMW with Alaska
registration JMF-995, which was in the next lane, diagonal to the
front of TFO Pawlak's vehicle. TFO Pawlak observed the driver of the
Ford Explorer as being HILL, as HILL exited his vehicle, walked around
the front of the BMW and entered the front passenger seat of the BMW.
HILL was in the BMW for less than one minute when he exited and
immediately returned to the silver Explorer. Before HILL entered the
Explorer, the BMW departed, driving south-west through the parking lot
and exited onto Penland Parkway. HILL immediately departed the area
in the Explorer, heading south-east through the parking lot. TFO
Pawlak's view into the BMW was obscured because the BMW had heavy tint
on the windows.

118. Alonzo HILL's criminal history as reflected by APSIN is extensive
and includes two felony drug convictions from 1999, a misdemeanor drug
conviction from 1998, a felony drug conviction from 1993, felony and
misdemeanor larceny convictions from 1986, a felony sex assault
against a minor from 1986, and numerous driving offenses as recent as
2018.

119. At approx. 11:59 hours, I saw and positively identified Prentiss
De Aun JONES as JONES walked up the walkway from the direction of the
parking area of #144. JONES opened the door to #144 and entered the
residence. At 12:03 hours, I watched a tall black male adult as he
walked up the walkway from the direction of the parking area. The
male appeared to knock at the door to #144. The door was opened from
w/in, and the male entered #144. Pawlak then drove past the residence
and saw the silver BMW w/ tinted windows was parked in the driveway.
The BMW did not have a front license plate attached, but Pawlak did
see a handi-cap parking placard hanging from the mirror. Pawlak also
noted a black Chevrolet Equinox, JKB-522 was parked in the roadway at
the foot of the parking area for space #144. APSIN shows JKB-522 is
registered to Michael Christopher HINTON, at an Anchorage address.

APSIN shows HINTON is on probation in Alaska under terms of an interstate compact agreement, with a felony assault conviction in Texas. APSIN further shows HINTON with two misdemeanor assault convictions from 2017, and misdemeanor convictions for unlawful contact and refusal to submit to a chemical test from 2014. In addition to the assault conviction from Texas, NCIC shows HINTON to have convictions for misdemeanor and felony assault from 2004; a vehicle theft conviction from 2008, and felony and misdemeanor convictions for credit card fraud from 2011.

120. At 12:09 hours, TFO Pawlak requested an APSIN check of JMF-995, which revealed the vehicle to be a 2011 silver BMW 550 registered to Prentiss De Aun JONES at the 3240 Penland Parkway #144.

121. At approx. 12:13, I saw a heavy female adult w/ blond hair as she walked up the walkway from the direction of the parking area for space #144. The woman appeared to knock at the door to #144, walking back down the ramp after no apparent answer. I drove out of the cul de sac and saw the woman on foot in front of space #120. Pawlak then took my position in the cul de sac.

122. At approx. 12:30, Pawlak sees a black male walking down the ramp, away from the door to #144 and towards the parking area for #144. The heavy woman w/ blonde hair then re-approached the door to #144. At approx. this point, I observe a black Chevrolet Equinox as it departs the trailer park and turns onto Penland Parkway, last seen travelling east on Penland Parkway.

123. At approx. 12:36, S/A Damon sees a heavy white female and a male consistent w/ Prentiss De Aun JONES as they get into the silver BMW in the driveway to #144. The BMW then pulls out of the driveway and is lost to sight.

124. At approx. 13:09 hours I see the silver BMW emerge from 3240 Penland Parkway, turning west onto Penland Parkway, and north onto Airport Heights. I catch up with the BMW at the intersection of Airport Heights and the Glenn Highway. I confirmed the license as JMF-995. Investigators followed the BMW west on 5th Avenue to the Chaz Unlimited body shop located at 1801 East 5th Avenue. The BMW pulled into the lot and parked. Investigators then saw a male on foot in proximity to the BMW. The BMW maneuvered around w/in the lot several times, with the driver appearing to use a cell phone. At approx. 13:29, the BMW departed the lot and travelled into the Mountain View neighborhood before traveling south on Boniface Parkway and then East on the Glenn Highway. The surveillance was terminated after the BMW took the exit for Arctic Valley Road.

125. During the morning of 1/7/19, I drove into the area of the suspected residence of Viki Rae KELLY located at 5218 Taku Drive #3. I parked in the area to observe. At approx. 10:35, I watched as Viki Rae KELLY emerged from the door of 5218 Taku Drive #3 onto the second floor deck. KELLY walked to railing of the deck and appeared to be speaking to a neighbor to the east. After several minutes, KELLY walked back inside #3. KELLY again emerged from the door to #3 at approx. 11:05. KELLY smoked and walked around on the deck for a while before appearing to engage in a hands-free phone call. KELLY went in and out of #3 several times, eventually collecting two white garbage bags from the floor adjacent to the door to #3 and carrying them north on the deck, going out of sight. KELLY came back into sight w/out the garbage bags and went back inside #3. I departed the area.

**EARL's APPARENT RETURN TO ANCHORAGE, 1/24/19**

126. During the early morning hours of 1/24/19, I received data from the tracker on the white Tundra. The data showed Tundra to have departed the area of 3307 Cope Street #A at approx. 01:01 hours.

127. The data showed the Tundra travelled to the area of 3711 Casper Court, arriving and stopping at approx. 01:08 hours. The building at 3711 Casper Court is a multi-unit apartment building. The suspected occupants of the building include Rayel Lamar SHOULDERS, as a white Ford Expedition has been among the vehicles present at the building on occasions while the white Tundra was present at the building. NCIC shows that in 2005, SHOULDERS was convicted and sentenced to 151 months incarceration for possession of cocaine w/ intent to distribute in the District of Alaska, and that his period of supervised release was terminated early. Further, SHOULDERS' criminal history as reflected by APSIN shows felony convictions for unsworn falsification from 2018, dangerous drugs from 1992, and burglary and larceny convictions from 1987. Investigators have seen the white Expedition driven by a Samoan male who is not SHOULDERS.

128. After approx. 9 minutes in the area of 3711 Casper Court, the data showed the Tundra to depart and travel to the Peanut Farm, arriving at approx. 01:22. At approx. 01:40, an APD detective observed the white Tundra, JKP-328 parked in the lot of the Peanut Farm, occupied by a driver, but not running. Data then showed the Tundra travelled back to the area of 3711 Casper Court, where it stopped for 3 minutes before departing and returning to the area of 3307 Cope Street #A.

129. At approx. 07:06 hours, I drove into the area of 3307 Cope Street #A. The white Tundra, the previously observed Durango, EHE-979, the

grey Taurus and the silver Frontier were all present. I saw fresh
tire impressions in the snow leading to and from the Tundra and the
Durango, consistent w/ recent movement.

130. At approx. 10:01 hours, I received data from the tracker
indicating the Tundra had departed the area of 3307 Cope Street #A.
At approx. 10:02, I saw the white Tundra, JKP-328 parked in the lot of
the Holiday Station convenience store located at 36th Avenue and "C"
Street. The Tundra was parked unoccupied w/ the ignition running. At
approx. 10:04, I saw and positively identified Harvelle Lee EARL as he
came out of the Holiday store carrying a white shopping bag. EARL was
wearing a blue knit hat w/ a puff ball on top, a gray sweat shirt.
EARL opened the rear door of the Tundra and placed the shopping bag
inside the cab. EARL then got into the driver seat and departed in
the Tundra.

131. Investigators followed EARL as he drove the white Tundra from the
Holiday, to a laundry service located at the intersection of 36th
Avenue and Arctic Blvd., and then to the area of 3711 Casper Court,
where he took on a heavy Samoan male as passenger. EARL and the male
travelled in the Tundra from Casper Court back to the laundry service
before travelling to Kay's restaurant located on Spenard Road, where
the two entered and remained until approx. 11:42. At approx. 11:42,
EARL and his passenger returned to the Tundra and drove back to the
laundry service and then back to the area of 3711 Casper Court, where
EARL apparently dropped off the male, departing at approx. 12:08.
Investigators followed EARL in the Tundra as he drove to the area of
the Carr's shopping center located at 4000 West Dimond Boulevard.
EARL parked at the West end of the shopping center and entered a
business w/ a name similar to "Thai Massage". Approx. 30 seconds
later, EARL exited the business and returned to the Tundra, opening
the rear door and placing an item inside the cab before getting into
the driver seat and driving from the lot. Investigators followed EARL
in the Tundra as he drove back to the area of 3307 Cope Street #A,
where at approx. 12:31, EARL was seen ascending the stairs to #A
carrying a laundry basket containing what appeared to be clothing and
a tan rectangular shaped item, consistent w/ a cardboard parcel. At
the top of the stairs, EARL turned towards the location of the door to
#A and appeared to be struggling to produce keys before entering the
door.

132. That afternoon, at approx. 14:48, investigators followed as
Harvelle Lee EARL departed the area of 3307 Cope Street #A in the
Tundra and drove east across Anchorage to the Tikahtnu Commons
shopping center, where EARL spent about 15 minutes inside a jewelry
store. On departing the jewelry store, investigators followed EARL to

the area of 3240 Penland Parkway #144.  EARL arrived driving the
Tundra and parked at approx. 15:33 hours.  On EARL's arrival,
investigators observed the arrival of a silver BMW sedan which backed
into the driveway of the #144.  Investigators have previously observed
a silver BMW, JMF-995 in the driveway of the 3240 Penland Parkway
#144.  APSIN shows the silver BMW is registered to Prentiss De Aun
JONES at 3240 Penland Parkway #144.  A silver Nissan Rogue then
arrived and parked directly behind the Tundra. At approx. 16:57,
investigators saw that the Nissan Rogue had departed but that a black
Dodge Charger had arrived as well.  APSIN shows Prentiss Deann JONES
Jr. owns a black Dodge Charger, JXX-278, registered to 3240 Penland
Parkway #144

133. At approx. 17:27, investigators noted that the Tundra was
running, and at 17:40 hours, the Tundra departed the area of 3240
Penland Parkway #144.  The Tundra travelled west across Anchorage,
arriving and parking at 3307 Cope Street #A at approx. 17:55.
Investigators remained in the area to observe.

134. At approx. 19:17 hours, data from the tracker showed the Tundra
depart the area of 3307 Cope Street #A.  Investigators followed as the
Tundra travelled to the area of the TGI Friday's restaurant located at
Tudor and "C" Street.  The Tundra parked on the south side of the
restaurant away from other parked vehicles save two.  T/F/O D.
Boothroyd drove past the parked Tundra and saw the driver was Harvelle
EARL as EARL's face was illuminated by the screen of the cell phone he
was speaking into.  EARL remained in the Tundra.  Approx. one minute
after the Tundra arrived and parked, a Dodge Caliber, JMK-350, w/ a
white ski-box on the roof arrived and parked adjacent to the Tundra.
The cab lights of the Tundra then came on, suggesting the door had
been opened.  Approx. 2 minutes later, a male consistent w/ Harvelle
EARL in size and attire was seen getting out of the front passenger
seat of Dodge and into the driver seat of the Tundra.  Both vehicles
then departed the Friday's lot.  Based on my training and experience,
and considering the location and brevity of the meet, as well as the
failure of occupants from either vehicle to enter the restaurant, I
recognize the interaction between EARL and the occupant of the Dodge
as consistent w/ a drug transaction.  The Tundra and the Dodge each
departed the lot immediately after the apparent transaction.  EARL was
followed to a restaurant, where he parked and joined a female and the
Samoan male previously observed at 3711 Casper Court.  After the meal,
the Samoan male departed driving Rayel SHOULDERS' white Ford
Expedition. Investigators followed EARL as he drove the Tundra back to
the area of 3307 Cope Street #A, arriving and parking at approx. 21:01
hours.

135. On 1/25/19, I monitored data from the tracker indicating the white Tundra arrived and parked at the 3240 Penland Parkway #144 at approx. 14:02 hours and departed at approx. 14:16, a stay of approx. 11 minutes. At approx. 14:20 hours, investigators observed the Tundra travelling on Arctic Blvd. and saw that Harvelle EARL was driving and had the unidentified Samoan male from 3711 Casper as passenger in the Tundra.

## RECENT DEVELOPMENTS

136. Yesterday afternoon, at approx. 16:49 hours, I monitored data from the tracker indicating that the white Tundra, JKP-328 had arrived in the area of the 10th & M Seafood store located at 301 Muldoon Road. EARL has previously been observed at this location acquiring insulated fish boxes.

137. At approx. 17:06, data from the tracker indicated the Tundra departed the area of the seafood store. I alerted t/f/o D. Boothroyd and USPSI s/a Andrew Grow to these events and explained that I suspected the fish box would be used to transport drug proceeds from Alaska to sources of supply located outside of Alaska, either by Harvelle Lee EARL himself or by a courier via commercial airline travel.

138. Tracker data showed the Tundra to travel to the Fred Meyer store on Muldoon Road before travelling to the area of 3307 Cope Street #A, arriving and parking at approx. 17:45. At approx. 18:43 I drove into the area of 3307 Cope Street #A and saw the Tundra parked in the driveway.

139. I remained in the area. At approx. 21:48 hours, data showed the Tundra to depart the area of 3307 Cope Street. Data showed the Tundra to travel toward the area of 3711 Casper Court. I started that way. After a stop at a Holiday convenience store, tracker data showed the Tundra to arrive in the area of 3711 Casper Court at approx. 22:06 hours. I arrived at the same time. I saw the white Tundra parked adjacent to the white Ford Expedition, GCV-265. As I arrived, EARL was outside the Tundra, standing w/in the open wingspan of the driver's door to the Tundra. EARL then opened the rear door to the Tundra and accessed the interior of the cab before closing both the rear and driver's door. At this point, a blue sedan arrived and parked in the parking area to 3711 Casper Court. EARL appeared to stiffen at the sight of the blue sedan. EARL watched as an occupant of the blue sedan walked from the sedan towards the entry to the building. The lights on the Tundra then flashed, consistent w/ locking the Tundra via key fob. EARL then walked towards the entry of

3711 Casper Court. EARL and a subject eventually identified as
Kapesia Montray GRAY then walked into sight from the direction of the
entry door to 3711 Casper Court. The lights on the Tundra again
flashed. GRAY appeared to be carrying an item of luggage as he walked
to the passenger door. EARL opened the driver door and then the rear
passenger door and was joined by GRAY on the driver's side of the
Tundra. EARL and GRAY both leaned into the back of the cab. EARL then
removed what appeared to be an insulated fish box from the rear of the
cab and placed it into the bed of the Tundra. EARL and GRAY got into
the Tundra and drove to the airport, with me following. I alerted
Boothroyd and Grow, who saw the Tundra arrive on the departures ramp
of the Ted Stevens International Airport. Grow, who was inside the
terminal, then saw GRAY walking with a black roller style suitcase
with an insulated fish box positioned on top. GRAY approached the
Alaska Airlines ticketing counter where he checked the fish box as
luggage. Boothroyd obtained GRAY's travel itinerary and learned
GRAY's identity as Kapesia GRAY, and that GRAY had purchased a ticket
on Alaska Airlines flight #150 to LAX. Grow and Boothroyd entered the
baggage well and located the insulated fish box. Boothroyd told me
that he now recognized GRAY as the subject he had previously described
to me as a "Samoan" male, and whom Boothroyd had observed driving the
white Ford Expedition, well as on foot in the area of 3711 Casper
Court and as a passenger of EARL's in the Tundra.

140. The insulated fish box measures approx. 26 by 11 by 8 ½ inches
and weighs approx. 16 pounds. It bears an adhesive "10th & M Seafood"
sticker as well as an adhesive "baggage" style label bearing passenger
info as "GRAY/KAPESIA" as well as the flight number of #150 and LAX as
destination. All seams of the fish box are taped. Boothroyd and Grow
seized the fish box. GRAY presumably departed on his LAX flight
unaware of the seizure of the fish box. We summoned APD canine
officer L. Tulip, who responded with his trained scent detection
canine, "Alex". On his arrival, I asked Tulip to have Alex sniff the
parcel for the odor of controlled substances. After doing so, Tulip
told me Alex did not give an indication on the fish box. As stated
above in paragraph 25, I have previously encountered instances wherein
a canine did not give an indication to a parcel despite the parcel
later being found to contain drugs and / or drug proceeds, and am
familiar with reasons this may happen. Further, as stated above,
investigators have twice seized suspected drug proceeds in this
investigation wherein they were concealed w/in sealed metal cans. A
copy of Tulip's Performance Record of Scent Detection Canine Team
Officer Lars Tulip and K-9 "Alex" is attached as an exhibit. I seized
the fish box and secured it at the Anchorage office of the DEA, where
it remains pending this application.

150. Regarding Kapesia Montray GRAY and his association to 3711 Casper Court, I spoke with s/a Grow, who told me as follows: according to USPIS's postal records, on January 8, 2019 First Class parcel 9500 1130 2198 9008 1707 70 was mailed to "Kapesia Gray, 3711 Casper Court Apt.3, Anchorage, Alaska, 99502" and sent from "Yvonne Gray, 3803 South Mason G202, Tacoma, WA 98409."

151. According to postal records the parcel weighed seven (7) ounces and cost $3.75 in postage. The shippers address is Kapesia Gray's residence in WA. The shippers name is Kapesia Gray's mother. Since this parcel was sent first class mail, was sent from Kapesia Gray's mother, and the return address is Kapesia Gray's it is consistent with normal mailings not the mailings of narcotics. It is a common practice for the shippers of narcotics to use Priority Mail Express and Priority Mail because the parcels arrive faster and within two to four days, not First Class mail.

156. From surveillance conducted by Grow and other law enforcement agents we have seen Kapesia Gray at 3711 Casper Court, Anchorage, AK 99502. In addition, a USPS parcel that is not consistent with narcotics mailings was sent to Kapesia Gray at 3711 Casper Court Apt. 3, Anchorage, AK 99502. Based on my experience, training, and discussion with other law enforcement officers experienced in drug investigations, people receive their normal mail at the address where they are residing.

157. GRAY's travel itinerary for the LAX flight lists GRAY's address as 3808 S. Mason Ave. Tacoma, WA 98408.

158. This morning, at approx. 06:45, I went into the area of 3711 Casper Court #3. The white Ford Expedition GVC-265 was among the vehicles present in the parking area of the building.

159. NCIC shows that Kapesia Montray GRAY was convicted and sentenced to 41 months incarceration for possession and distribution of a controlled substance in the District of Alaska and indicates he served his period of supervised release in Tacoma, WA. GRAY's criminal history according to APSIN includes misdemeanor convictions for assault from 2004, criminal mischief from 1996, and failure to appear from 1995. Additionally, in 2013, Kapesia GRAY accepted delivery from an undercover DEA agent parcel which had previously contained approx. 340 grams of cocaine. GRAY accepted the parcel and transported it w/in Anchorage. When confronted by law enforcement, GRAY denied knowledge of the parcel's sender and the contents of the parcel. Charges against GRAY were declined.

160. Based on the information provided herein, I submit there is probable cause to search the TARGET RESIDENCE for the items described in Attachment B.

Respectfully submitted,

G. K. Dorr, T/F/O, D.E.A.

Subscribed and sworn to before me Telephonically
On January 27 , 2019:

UNITED STATES MAGISTRATE JUDGE

MATTHEW M. SCOBLE
U.S. Magistrate Judge